**Elizabeth E. HELLER, Plaintiff,**

v.

**COLUMBIA EDGEWATER COUNTRY CLUB, an Oregon corporation, Defendant.**

**No. CIV. 01–316–JE.**

United States District Court, D. Oregon.

March 5, 2002.

Craig Alan Crispin, Shelley Dennis Russell, Crispin & Associates, Portland, ME, for Plaintiff.

Charles W. Carnese, Charles W. Carnese, P.C., Douglas R. Andres, Bullivant Houser Bailey, Portland, ME, for Defendant.

*ORDER*

ROBERT E. JONES, District Judge.

Magistrate Judge John Jelderks filed Findings and Recommendation (# 39) on January 3, 2002, in the above entitled case. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). When either party objects to any portion of a magistrate judge's Findings and Recommendation, the district court

must make a *de novo* determination of that portion of the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Defendant has timely filed objections. I have, therefore, given *de novo* review of Magistrate Judge Jelderks' rulings.

I find no error. Accordingly, I ADOPT Magistrate Judge Jelderks' Findings and Recommendation (# 39) dated January 3, 2002, in its entirety. Defendant's motion for summary judgment (# 14) is DENIED.

IT IS SO ORDERED.

FINDINGS AND RECOMMENDATION

JELDERKS, United States Magistrate Judge.

Plaintiff Elizabeth Heller brings this employment-related action against defendant Columbia Edgewater Country Club (the "Club"). Defendant moves for summary judgment on all claims. I recommend that motion be denied and the matter set for trial. Defendant's motion to strike certain evidence from the record is denied.

LEGAL STANDARDS

The purpose of a summary judgment motion is to determine whether there are genuine issues for trial. Summary judgment will be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FRCP 56(c). A material fact is one that may affect the outcome of the action. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment may be granted, despite the presence of some factual disputes, if the resolution of those disputes could not change the final result. *Id. See also* Brunet, Redish, & Reiter, SUMMARY JUDGMENT: FEDERAL LAW AND PRACTICE § 6.04 (2d ed 2000).

When a defendant moves for summary judgment, the plaintiff must proffer evidence that, if believed by a jury, would be sufficient to permit the jury to return a verdict in favor of the plaintiff at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence, and any reasonable inferences that may be drawn from it, must be viewed in the light most favorable to the non-moving party. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir.2001).

BACKGROUND

The facts of this case are vigorously disputed, and the defendant has categorically denied any wrongdoing. However, for purposes of this motion, when facts are in dispute the court must assume that any admissible evidence proffered by the plaintiff is true, and must also draw all reasonable inferences from the evidence in the plaintiff's favor. This requirement necessarily shapes the court's discussion of the facts.

Plaintiff Heller was employed by the Club, as a line cook, from approximately June 9, 1999, through May 17, 2000. She was recommended for that position by the Club's sous chef,[1] David Strouts, who also is Heller's cousin. The sous chef, Strouts, reported to the Executive Chef, Carol Cagle. The latter often was present in the kitchen and exercised direct supervisory control over Heller if both were on duty at the same time. It is undisputed that Ca-

---

**1.** Literally, the "under chef" to the Executive Chef. "His duties were to operate the night crew, the p.m. staff, oversee banquets, [and] oversee [food] preparation" when the Executive Chef was not in the kitchen. Cagle Depo. at 12.

gle had the power to hire and fire employees.

Plaintiff is a lesbian. She didn't announce that fact to her co-workers, but didn't try to hide it either. During the course of normal conversations, Heller would mention her girlfriend, just as other employees talk about their boyfriend or spouse.

Plaintiff has produced evidence from which a jury could conclude that Cagle harbored strong biases against homosexuals,[2] and openly voiced these views during management meetings. For this reason, Strouts says, when he recommended that Cagle hire Heller, he also felt compelled to tell Cagle that Heller is homosexual:

> I just said, "My cousin's coming back from Sacramento. She's an excellent cook. She's been working at a club for several years." I said, "You may have a problem. She's gay, but I know your (sic) really hurting for cooks. And I worked fine with her. I worked with her at the zoo. I know what she can do. She's got a great pair of hands and she's very quick. Let's bring her on."

Strouts Depo. at 48. According to Strouts, Cagle "wanted to talk to her" first and he assumed that she did, because Heller was soon hired. Cagle's recollection of this conversation is very different. She says she didn't meet Heller until after the latter was hired, and first learned that Heller is a lesbian a week or two later.

Heller's first few months at the Club were comparatively uneventful (compared to what allegedly followed), but that changed around the time a Ladies Professional Golf Association (LPGA) Tournament was held at the Club (approximately September 1999). Cagle allegedly became increasingly obsessed with the fact that Heller was having an intimate relationship with a woman, and otherwise failing to comport with Cagle's notions of how a woman ought to behave. In his deposition, Strouts testified that Cagle made derogatory comments regarding this subject "daily .... It was kind of an ongoing monologue," a "constant mantra ... of negative background noise," "a litany ... it happened all the time." Strouts Depo. at 38, 52, 64. Many of the statements were made directly to Heller or in her presence, while others were made to Strouts and other Club employees.

Cagle allegedly asked Heller questions such as, "Do you wear the dick in the relationship?" and, "Are you the man?" Another time, when Heller inquired, "don't I look cute in this dress," Cagle allegedly responded, "Oh, I thought you were the man." Other remarks of this sort were along the lines of, "I thought you wore the pants." Heller also recalls Cagle commenting on her "faggy shoes," which Heller construed as a reference to Heller wearing "men's shoes."

On a number of occasions while conversing with Heller in the kitchen, Cagle made references to her that included words such as "fag," "faggy," and "homo," or "I thought that was a fag thing," "that's just a homo thing," or "Oh, you're just a homo."

After a second Club employee, Nick Doolittle, disclosed that he was gay, Cagle allegedly complained to Strouts, "Now that Nick's been hanging around with Liz he's gone fag, too. I can't believe this. What have you done to my staff?" Cagle asked Heller, "Did you rub off on him?" When Heller started to walk past Cagle in the kitchen, Cagle allegedly exclaimed, "Stay away from me because it might rub off on me," and "No, no, don't come near me."

---

**2.** Cagle has categorically denied the allegations of bias described in this opinion. Accordingly, the reader should insert the word "allegedly" after each such allegation.

Another employee, Amanda Guerrero, told Heller that Cagle had said (about Heller), "She must have rubbed off on [Nick]," accompanied by a limp wrist gesture. When Doolittle bleached his hair (similar to Heller's hair), Cagle remarked to Heller, "It must be a fag thing." Heller also heard (she thinks it was from a department manager, Jerry Carpenter) that Cagle was telling other employees that "Going out with [Heller] made Nick gay."

Doolittle and Heller (*i.e.*, the only openly homosexual employees in the kitchen) both worked on the "night crew." Cagle became increasingly critical of that crew, making statements such as, "What happens here at night? Just one big fag party?" or "What is going on down there? Are you just having some kind of fag party at night?" Strouts testified that Heller was "deeply offended" by that remark, and that Heller and Strouts discussed it afterward "many, many, many times." Heller also recalls Cagle making comments to her such as, "Is this a fag party?" and "Is this a homo party, or what?" (directed at Heller and Doolittle).

At some point, Cagle learned "through rumors" that Heller's lover was of a different race. Cagle allegedly complained to Strouts, "Being a lesbian isn't bad enough, she has to date a Black girl." Strouts conveyed to Heller what Cagle had said. Heller Depo. at 83–84. Strouts also recalls Cagle saying to Heller, "I can believe you're dating women, but I can't believe you're dating a black woman." Strouts also recalls Cagle repeatedly expressing to him her consternation that Heller was "sleeping with niggers." Later, when Heller and her lover apparently separated, Cagle allegedly told Strouts, "I'm glad she's finally broke[n] up with that nigger." Strouts Depo. at 145.

During her deposition, Heller did not recall Cagle directing explicit racial remarks at her, but she did recall Cagle instructing Club employees to "hide all the valuables" when the Club was hosting a banquet for the NAACP. In conversing with Heller, Cagle also allegedly used the term "that thing" when referring to Heller's girlfriend.

Several witnesses testified that Cagle made numerous derogatory remarks about Hispanic (and Mayan) employees, referring to them as "beaners," "wetbacks," "dirty Mexicans," "lazy," "good-for-nothings," etc. Cagle also allegedly complained that "Those fucking Mexicans are robbing me blind" and instructed Strouts to watch the Hispanic employees because Cagle believed they were punching the timeclock for each other.[3]

There is evidence that Heller was deeply hurt and offended by many of Cagle's comments regarding her, that Cagle's remarks were unwelcome and uninvited, and that they interfered with Heller's performance of her job duties. Heller says she frequently discussed her concerns about Cagle's behavior with her supervisor, Strouts, who also was very disturbed by Cagle's behavior. "I just remember it was very uncomfortable, and [the subject of Heller's sexuality] was brought up often [by Cagle], and it was brought up in a derogatory fashion to the whole staff, the whole kitchen staff. And I remember feeling uncomfortable about it and telling Carol [Cagle] that lots of times privately." Strouts Depo. at 41–42.

However, Cagle did not alter her behavior. On the contrary, when Strouts tried to explain to Cagle that her behavior was offensive to other Club employees, some of whom were gay but had not yet "come

---

3. Again, I emphasize that at this stage of the case these are merely allegations, and a jury could conceivably decide that Cagle never made any of these statements.

out," Cagle-far from apologizing—allegedly insisted that Strouts identify the secretly gay Club employees (which Strouts refused to do).

There is evidence from which a jury could conclude that the Club's management was aware of Cagle's biases and behavior toward Heller and others. From the record, it appears that the Club is a single location; this is not a case where the home office is unaware of misconduct occurring at a remote branch office. Strouts was a supervisor, and Cagle a manager. Heller testified that, in addition to Strouts, she often commiserated with the Club's Food and Beverage Manager, Jerry Carpenter, about the harassment by Cagle. Heller Depo. at 88–89. Although there may be some dispute regarding the exact dates they talked, Carpenter has confirmed he knew that Heller believed Cagle was discriminating against her. Carpenter Depo. at 12–13. There also is evidence that Strouts, Cagle, Carpenter, and Stephanie Akins (the Catering Director) regularly met, and that Cagle made comments during those meetings evidencing bias. *See, e.g.,* Carpenter Depo. at 11, 18, 38; Heller Depo. at 91.[4]

Although Heller complained about Cagle's conduct to her own supervisor (Strouts), to another department manager (Carpenter), and also to fellow employees, Heller did not confront Cagle directly until February 18, 2000. On that day, Cagle issued Heller a written "write-up" which accused Heller of "[c]onstant disrespect towards the chef, other supervisors and coworkers," "[c]ontinual use of foul language in a working environment," "[h]abitual tardiness," "not following closing pro-

cedure as implemented by the chef," and "[l]ack of ability to be a team player." Prior to this, Heller recalls no discussions with Cagle regarding any deficiencies in her job performance or attendance. Heller Depo. at 108.

Heller disputed each of Cagle's allegations, in whole or in part. Heller did admit to being tardy and to cussing in an employee-only area, but argued that she was being singled out for conduct also engaged in by other employees, including Cagle herself. Heller also testified that Cagle refused to explain what she meant by certain accusations (e.g., "lack of ability to be a team player").

Heller then confronted Cagle about her own conduct, recounting many statements that Cagle allegedly had made to Heller, and told Cagle she found such remarks "very offensive." Cagle refused to discuss the matter, saying "This is not about me, it's about you." Heller then went to Jerry Carpenter to discuss both the write-up and also Cagle's behavior toward Heller. Carpenter advised Heller to share her concerns with the Club's General Manager, Mike Gallagher. However, Carpenter was sufficiently concerned about Heller's allegations that he personally reported them to Gallagher as well.

Heller went to see Gallagher, and they discussed the write-up as well as her allegations of harassment by Cagle. With regard to the latter, Gallagher told Heller, "That's not tolerated here" and said he would talk to Cagle and then get back to Heller.

---

4. Cagle, Carpenter, and Akins were at the same management level, and all reported to the General Manager (and Chief Operating Officer) Mike Gallagher. Gallagher Depo. at 17. The "unnatural" comment about Heller which was attributed to Cagle through Carpenter (Heller Depo. at 91) poses some interesting evidentiary issues, though it might be admissible to show the Club's management had knowledge of possible discrimination. However, given the other remarks and evidence, that evidentiary issue does not affect the outcome of this motion.

**1220**

Whether Gallagher ever did discuss the matter with Cagle is a disputed question. Gallagher says he did, and that he reminded Cagle that such conduct was forbidden, but she categorically denied ever engaging in the behavior described by Heller. However, Cagle testified at deposition that Gallagher never mentioned the matter to her. Heller recalls speaking to Gallagher about a month after the initial conversation, at which time Gallagher told Heller he hadn't had a chance to talk to Cagle yet. It is possible that Gallagher spoke to Cagle some time thereafter, but—if he did—he never told Heller.

When her complaint to Gallagher did not reduce the frequency of Cagle's harassment, Heller says she decided to take her complaints to the President of the Club or its Board of Directors (and told a fellow employee, Amanda, of her intentions). Before Heller could act, however, Cagle fired both Heller and Strouts. During her deposition, Cagle testified that she fired Heller "for her lack of being a team player and vulgar language; her lack of doing her job duties." However, a jury could conclude that some of the reasons given by Cagle were false,[5] and that the importance of the other stated reasons was exaggerated. Heller also testified that, following the "write-up" in February, she received no guidance from Cagle (or anyone else) on improving her allegedly deficient job performance, and she received no further oral or written warnings prior to her discharge.

Within days after Strouts and Heller were fired, Amanda (an employee perceived as being friendly with Heller and Doolittle) either resigned or was discharged. Nick Doolittle (the other openly gay employee) soon departed as well; the circumstances of his departure are in dispute. Two months later, Jerry Carpenter

was fired. He testified at deposition that, to this day, he has never been told why he was discharged.

Cagle has never been disciplined in any way for the behavior alleged herein. After Heller was fired, Cagle reportedly told Strouts' replacement, "It is a good thing the dyke is gone."

### MOTION TO STRIKE

■ The Club moves to strike portions of the Heller Declaration (# 30) that allegedly conflict with Heller's sworn deposition testimony. I deny the motion. Defendant failed to "close the door" at deposition. Heller was never asked how frequently such events took place, e.g., does she claim to have been harassed daily, once a week, or once a month? Counting the specific events recounted by Heller is a poor substitute, especially when Heller made clear that it was not an exhaustive list and she didn't recall the details of each and every incident, and she used words such as "couple" to mean *at least* six or seven." It also is difficult to determine whether some events she described are redundant (for instance, does "faggy" shoes count against the total number of "fag" remarks?) In addition, Strouts testified that he witnessed Heller being harassed by Cagle on essentially a daily basis. As a practical matter, whether there were "only" 23 incidents of alleged harassment in a nine month period, or 123, will have little effect on the outcome of the summary judgment motions.

■ I also deny Defendant's motion to strike all references in the record to derogatory racial comments by Cagle. Although it was not a focus of the summary judgment briefing, the Amended Com-

---

**5.** Viewing the evidence in the light most favorable to Heller, some of the reasons given by Cagle did not withstand scrutiny at her deposition, or were contradicted by other witnesses.

plaint specifically mentions such incidents, and asserts that Heller was discriminated against and ultimately terminated in part because she opposed such discrimination. The derogatory racial comments by Cagle also bear upon the totality of the workplace environment, and whether a reasonable woman would have perceived Cagle's gender-related comments to be jovial office banter or malevolent remarks intended to cause pain. Cagle's alleged use of racial slurs in the workplace (*e.g.*, niggers, wetbacks, fucking Mexicans) is also relevant because use of "vulgar" language in the workplace was one reason Cagle proffered for discharging Heller. Given Cagle's own use of profanity, a jury might question whether Cagle has exaggerated the significance of that criteria. Although I deny the motion to strike, Defendant is not precluded from asking the court to revisit this issue by way of a motion in limine at trial.[6]

### SUMMARY JUDGMENT MOTIONS

*Validity of City of Portland Ordinance*

◼ Section 23.01.050 of the Code of the City of Portland (Oregon) provides that "it shall be unlawful to discriminate in employment on the basis of an individual's sexual orientation [or] gender identity ... by committing against any such individual any of the acts already made unlawful under ORS 659.030 when committed against the categories of persons listed therein." Section 23.01.080 specifies the remedies available if the ordinance is violated. For purposes of this motion, it is undisputed that the conduct at issue occurred within the City of Portland.

◼ The Club asserts that the City of Portland lacked authority, under state law, to enact this ordinance. If I were writing on a clean slate, perhaps I might find the Club's argument persuasive, but the slate is not clean. When interpreting state law, a federal court ordinarily[7] must follow decisions from that state's highest court. In the absence of a controlling decision, the federal court must predict how the state's highest court would decide that issue. *Spear v. Wells Fargo Bank, N.A.*, 130 F.3d 857, 861 (9th Cir.1997). Although the Oregon Supreme Court has not addressed this issue, the Oregon Court of Appeals squarely rejected an identical challenge to the City's ordinance. *Sims v. Besaw's Café*, 165 Or.App. 180, 997 P.2d 201 (2000) (en banc). Absent "convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Spear*, 130 F.3d at 861; *Nelson v. City of Irvine*, 143 F.3d 1196, 1206–07 (9th Cir.1998).

The Club disagrees with the decision in *Sims*, but offers no "convincing evidence" that the Oregon Supreme Court would reach a contrary result. *Sims* is a very recent decision by the entire court sitting en banc, and the vote was not close (nine to one). Although the Court of Appeals did issue multiple opinions, they simply reflect different routes to the same result. The Club points to several opinions in which District Court Judges Marsh and Frye had predicted that the Oregon Supreme Court would declare the law invalid, but those predictions predate *Sims*. The Oregon Court of Appeals specifically acknowledged and rejected those authorities. *Sims*, 165 Or.App. at 195, n. 18, 997 P.2d 201.

◼ Next, the Club contends that, in an action alleging a violation of the ordinance, a prevailing plaintiff is limited to the equi-

---

**6.** To avoid including an Order within what is otherwise a Findings and Recommendation, the court will issue a separate minute order denying the Motions to Strike.

**7.** The few exceptions are not applicable here.

table remedies described in ORS 659.121(1), and may not recover damages. I disagree. Section 23.01.080(E) of the Portland City Code provides that:

> Any person claiming to be aggrieved by an unlawful discriminatory act under the provisions of this code shall have a cause of action in any court of competent jurisdiction *for damages and such other remedies as may be appropriate.* Election of remedies and other procedural issues relating to the interplay between administrative proceedings and private rights of action shall be handled as provided for in ORS 659.095 and 659.121. *The court may grant such relief as it deems appropriate, including, but not limited to, such relief as is provided in ORS 659.121.*

(emphasis added). Defendant wants this court to insert "(1)" after ORS 659.121–thus eliminating the damages remedy available under ORS 659.121(2)—and also to ignore the word "damages" in the first sentence and the words "but not limited to" in the third sentence. I decline to rewrite the ordinance in that fashion. The plain language of the ordinance leaves no doubt regarding the intent of the drafters.[8] I also reject defendant's argument that non-economic and punitive damages are unavailable. ORS 659.121(2) expressly authorizes an award of "compensatory damages ... and punitive damages," and nothing in the ordinance evidences an intent to deny those remedies.

### Applicability of ORS 659.030

ORS 659.030 prohibits discrimination on the basis of an employee's sexual orientation. ORS 659.030(a), (b); *Tanner v. Oregon Health Sciences University,* 157 Or. App. 502, 515, 971 P.2d 435 (1998).

### Applicability of Title VII

Defendant contends that Title VII is inapplicable here because the discrimination was on the basis of sexual orientation. I disagree. Nothing in Title VII suggests that Congress intended to confine the benefits of that statute to heterosexual employees alone. Rather, Congress intended that all Americans should have an opportunity to participate in the economic life of the nation.

The Supreme Court has construed Title VII as prohibiting "sexual harassment." *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). "[A] requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets." *Id.* at 67 (quoting, with approval, *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted). Sexual harassment actionable under Title VII is not limited to harassment by members of the opposite sex, but includes "sexual harassment of any kind that meets the statutory requirements." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 79–80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (same-sex discrimination is actionable under Title VII).

If an employer subjected a heterosexual employee to the sort of abuse

---

**8.** One reason the drafters may have chosen to provide a damages remedy is the uncertainty, at the time the ordinance was adopted, as to whether Title VII provides a damages remedy in that circumstance.

allegedly endured by Heller—including numerous unwanted offensive comments regarding her sex life—the evidence would be sufficient to state a claim for violation of Title VII. The result should not differ simply because the victim of the harassment is homosexual. *Cf. Doe v. City of Belleville,* 119 F.3d 563, 575 (7th Cir.1997) (observing that if the plaintiff in that case had been a woman instead of a man, "there would be no agonizing over whether the harassment ... described could be understood as sex discrimination"), *vacated and remanded for reconsideration in light of Oncale,* 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998) (case settled on remand). Certainly the behavior is no less offensive, and the impact upon the employee's working environment is as great. The offensive conduct in question here does not appear to have been motivated by sexual desire on the part of Cagle, but sexual desire is not a prerequisite to liability under Title VII. *See Oncale,* 523 U.S. at 80 ("harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex"); *City of Belleville,* 119 F.3d at 586–88 ("no case that we are aware of holds that the harasser must have been sexually interested in the victim in order for a claim of sexual harassment to be viable").

In *Oncale,* the Supreme Court observed that—regardless of whether the sexual harassment is by a member of the same gender or of the opposite gender—the plaintiff must still "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discriminat[ion]* ... because of ... sex." *Id.* at 81 (emphasis in original).[9] One way (but certainly not the only means) of satisfying this requirement is to inquire whether the harasser would have acted the same if the gender of the victim had been different. *Id.* at 80–81. A jury could find that Cagle would not have acted as she (allegedly) did if Plaintiff were a man dating a woman, instead of a woman dating a woman.[10] If that is so, then Plaintiff was discriminated against because of her gender.

A less direct route to the same result is provided by *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989),[11] and *Nichols v. Azteca Restaurant Enterprises, Inc.,* 256 F.3d 864 (9th Cir.2001). In *Price Waterhouse,* the Supreme Court held that a woman who was denied partnership in an accounting firm

9. The Court made this statement in the context of explaining why there was little danger that the holding in the case would "transform Title VII into a general civility code for the American workplace." *Id.* at 80, 118 S.Ct. 998. "We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* For example, there are certain words that—although superficially describing a sexual act—may also be utilized during an argument to convey a range of antagonistic emotions having little to do with gender or sex and, in that circumstance, would not be the kind of harassment that is actionable under Title VII. *See Johnson v. Hondo, Inc.,* 125 F.3d 408, 411–13 (7th Cir.1997).

10. It is no answer that Cagle did not harass *all* women but only lesbian women. Certainly a man could not escape liability by arguing that he didn't sexually harass all women, but only those women he considered attractive. Nor is it a defense that Cagle also harassed gay men. Otherwise, a bisexual manager would be immune from liability so long as he demanded sexual favors from men and women alike, and pornographic pictures could be displayed on the office bulletin board so long as they were available for viewing by men and women equally.

11. A portion of the holding in *Price Waterhouse* regarding mixed motive cases was overruled by statute in 1991, but the bulk of that decision remains good law.

because she did not match a sex stereotype—*i.e.*, her appearance and behavior were considered too masculine—had an actionable claim under Title VII. In *Nichols*, the Ninth Circuit recently applied the same principle in holding that a male employee was entitled to redress under Title VII because his employer (through its employees) discriminated against him for not comporting with the employer's stereotypical notion of how a man should behave. *Nichols*, 256 F.3d at 874–75 (abrogating *DeSantis v. Pacific Telephone & Telegraph Co.*, 608 F.2d 327 (9th Cir.1979), which predated *Price Waterhouse* ). *See also Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir.2000) ("Discrimination because one fails to act in the way expected of a man or woman is forbidden under Title VII").[12]

Viewing the evidence in the light most favorable to plaintiff, a jury could find that Cagle repeatedly harassed (and ultimately discharged) Heller because Heller did not conform to Cagle's stereotype of how a woman ought to behave. Heller is attracted to and dates other women, whereas Cagle believes that a woman should be attracted to and date only men. Likewise, the impetus for the comments about Heller's "faggy" shoes was that Cagle perceived them to be men's shoes. Cagle also allegedly made a number of comments along the lines of "I thought you were the man," "I thought you wore the pants," and asked Heller who " w[ore] the dick in the relationship."

That Cagle perceived Heller as being a lesbian does not compel a different outcome. Although words such as "lesbian" or "butch" are not among the comments attributed to the employer in *Price Waterhouse*—or at least not in the published decision—it is unlikely that the Supreme Court would have reached a different result if such words had been on the lips of the decisionmakers. There also is no evidence that the result in *Price Waterhouse* would have been different if only there was proof the plaintiff actually *was* a lesbian.

The bottom line is that Heller was entitled to be treated the same as any other employee, no better and no worse. Under the circumstances of this case,[13] whether Heller was a lesbian or whether she conformed to Cagle's stereotype of how a woman should behave had no bearing upon her qualifications for the job, nor does it excuse the sexual harassment that allegedly occurred. The protections of Title VII are not limited to heterosexual employees only.[14] If Heller has produced sufficient

12. Several other circuits have stated, or hinted, that Title VII claims premised upon sexual stereotyping are actionable. *See City of Belleville*, 119 F.3d at 580–83 (7th Cir.) (male employee harassed because he was perceived as effeminate stated a claim) (opinion later vacated and case settled, but holding continues to be followed by district courts within that circuit); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259–61 (1st Cir. 1999) ("a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity" but denying relief because that theory wasn't asserted below); *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 262–63 (3d Cir.2001) ("a plaintiff may be able to prove that same-sex harassment was discrimination because of sex by presenting evidence that the harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender," but declining to decide question not argued below); *Simonton v. Runyon*, 232 F.3d 33, 37–38 (2d Cir.2000) (discussing theory but not deciding issue because it wasn't adequately alleged below).

13. I express no opinion regarding whether, in another circumstance, it might be relevant.

14. The holding here is a narrow one. As the Ninth Circuit cautioned in *Nichols*:

We do not imply that all gender-based distinctions are actionable under Title VII. For example, our decision does not imply that there is any violation of Title VII occasioned by reasonable regulations that

evidence to support the contentions in her Amended Complaint, then her claims are within the reach of Title VII.

### Sufficiency of Evidence—Sexually Hostile Environment

To prevail on her hostile environment claim, Heller must produce evidence from which a jury could conclude that 1) she was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995). For purposes of this motion, the first two prongs are easily established on these facts.

As for the third prong, the workplace must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The court must consider the "totality of the circumstances," from "the perspective of the reasonable victim." *Brooks v. City of San Mateo,* 229 F.3d 917, 923–24 (9th Cir.2000). Among the factors to be considered—but by no means an exhaustive list—are the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

The evidence produced by Heller, regarding whether she was subjected to a sexually hostile environment, is sufficient to survive a motion for summary judgment. Regardless of whether there were only "22 or 23" such incidents within about a nine month period, as defendant asserts (for purposes of this motion only)—or whether the derogatory remarks were made "daily .... kind of an ongoing monologue," as plaintiff contends—a jury could find that the harassment was sufficiently severe and pervasive as to alter the conditions of Heller's employment. Certainly a jury could find that this was more than just a few stray remarks, and that a reasonable person would find the work environment to be hostile or abusive, and that Heller did as well. There also is evidence from which a jury could find that Heller was deeply offended and humiliated by Cagle's behavior toward her, and that it adversely affected Heller's job performance.

An aggravating factor here is that Heller was young (just 23 years old when hired) and the harassment was at the hands of a (supposedly) mature executive with direct authority over Heller. A jury might conclude that it is easier for a victim to dismiss discriminatory remarks when they come from an 18–year old on the loading dock than from a person in authority. An employee-victim may also feel more vulnerable when the harasser is a direct superior to whom the employer has given considerable power over the employee, and the discriminatory conduct allegedly persists even after the employee has reported the harassment to several company managers.

Defendant argues that Cagle's conduct was not physically threatening to Heller. However, an employee need not

---

require male and female employees to conform to different dress and grooming standards.
*Nichols,* 256 F.3d at 875, n. 7. The harassment allegedly directed at Heller was not premised upon any failure to comply with her employer's dress and grooming standards or other rules established by the employer. On the contrary, the Club's General Manager testified that it is the alleged harassment of Heller that would violate the rules established by the employer.

be physically threatened or suffer physical consequences before the offensive conduct becomes actionable. *See Harris*, 510 U.S. at 22. *Cf. Nichols*, 256 F.3d at 873 (sustained campaign of verbal taunts regarding the plaintiff's sexuality, designed to humiliate and anger him, was sufficiently severe and pervasive to alter the terms and conditions of his employment).

Defendant also contends that Heller was not offended by Cagle's remarks because Heller sometimes engaged in (allegedly) similar behavior with people she felt close to, *e.g.*, jokingly referring to a gay male employee as "girlfriend" or allowing him to call her a "dyke." However, comments or conduct that may be welcome if originating from one specific person may be highly offensive if the source is anyone else. For example, a woman may be very pleased by sexual remarks and behavior coming from her husband, and yet be deeply offended by the identical behavior coming from her supervisor. Similarly, close friends may use words among themselves that might be regarded as grave ethnic slurs if uttered by an outsider or even with others present. *See* Heller Depo. at 24–25. *Cf. Nichols*, 256 F.3d at 873 ("As any sensible person would, [plaintiff] drew a distinction between conduct he perceived to be objectionable, and conduct that was not"). At a minimum, this presents a jury question.

That the harassment allegedly persisted even after Cagle was repeatedly told that her conduct was hurting Heller, and the

evidence that Cagle repeatedly uttered slurs against various ethnic groups, might also help to persuade a jury that Cagle's conduct towards Heller went far beyond the sort of "simple teasing, offhand comments, and isolated incidents" that generally are not actionable under Title VII. *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275.

### Sufficiency of Evidence of Retaliation

In order to make out a prima facie case of retaliation for purposes of Title VII, a plaintiff must show that (1) she was engaging in protected activity, (2) the employer subjected her to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action. *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754, 755 (9th Cir.1997). If the plaintiff does produce such evidence, the burden then shifts to the employer to produce evidence that the employment decision was made for a legitimate, nondiscriminatory reason. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer meets that burden, the burden shifts back to the plaintiff to show that the employer's proffered reason was a pretext for retaliation. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994).

Plaintiff's complaints directly to Cagle, and also to management personnel including Strouts, Carpenter, and Gallagher, are sufficient to satisfy the first prong.[15] It is undisputed that plaintiff was

---

**15.** The Ninth Circuit has held that 42 USC § 2000e–3(a) protects employee opposition not just to practices that are actually made unlawful by Title VII, but also to practices that the employee reasonably believes are unlawful. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (per curiam) (2000) (reserving judgment on whether that interpretation is correct); *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 506 (9th Cir.2000). Otherwise, an employee might be deterred from reporting possible dis-

crimination if she risked being discharged if the allegations—though entirely true and made in good faith—were later found insufficient to constitute a violation of the statute. Similarly, an employee who complains when the harassment first begins might be vulnerable to retaliation if the conduct had not yet risen to the level of a hostile work environment. Accordingly, under Ninth Circuit law, whether Cagle's conduct actually violated Title VII is not dispositive so long as Heller

subsequently discharged, thereby satisfying the second prong. Finally, Heller has produced evidence from which a jury could find a causal link between the protected activity and the adverse employment action.

██ Cagle, who made the decision to terminate Heller, was also the subject of Heller's discrimination complaints. There is evidence from which a jury could find that Cagle harbored strong biases against homosexuals and in particular against Heller. Cagle knew Heller had complained of discrimination, not only to Cagle herself but also to Strouts, to the Club's general manager Gallagher, and perhaps to others as well.[16] The comparatively close proximity between the complaint and termination is also probative[17]. *See Passantino,* 212 F.3d at 507 ("when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred").

A jury could also find informative Cagle's response to the discrimination complaints. There is no evidence Cagle ever acknowledged, let alone apologized for, her (alleged) behavior. According to Gallagher, Cagle flatly denied making such remarks. When Heller confronted Cagle directly, the latter reportedly refused to discuss the matter, asserting "This is not about me, it's about you." Strouts testified that he repeatedly told Cagle her conduct was offensive and hurtful, not just to Heller but also to other employees who—unbeknownst to Cagle—were gay. Cagle's response was not to apologize or to alter her conduct, but to ask Strouts for a list of all employees who were secretly homosexual. Heller, Strouts, and Carpenter each complained about Cagle's discriminatory conduct, either to Cagle directly or to the general manager Gallagher. Within the space of two months,[18] all three were discharged.[19] Carpenter testified that, to this day, he has never been given a reason for his termination. After plaintiff was terminated, Cagle reportedly told Strouts's replacement, "It is a good thing the dyke is gone."

██ The foregoing is sufficient to establish the third prong of Heller's prima facie case. The burden then shifts to the employer to articulate a legitimate non-discriminatory justification for the termination, which the Club has done. Heller must then come forward with evidence from which a jury could conclude that the employer's stated reasons are a mere pretext.[20] Pretext may be shown either (1) directly by persuading the jury that a discriminatory motive more likely than not motivated the employer or (2) indirectly by

could reasonably have believed that the conduct was unlawful.

16. While not clear from the record, Cagle may have known about Heller's complaints to others, such as Carpenter. Carpenter says he spoke to Gallagher regarding Heller's allegations, and Gallagher says he then discussed those allegations with Cagle.

17. There is some evidence that Gallagher didn't speak to Cagle about this subject until a month or more after Heller complained to Gallagher. Thus, the interval between when Cagle learned of that complaint and she terminated Heller may have been considerably less than 90 days.

18. At oral argument, one of the attorneys suggested the interval was six months. However, Carpenter testified that he was terminated in July 2000. Carpenter Depo. at 30.

19. At oral argument, the court was advised that still another employee, Amanda, objected to the termination of Heller and Strouts and then either resigned or was discharged.

20. There may also be a mixed motive issue in this case, but I will not address it separately here because the result would be the same.

showing that the employer's proffered explanation is unworthy of credence. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998). To establish pretext, "very little" direct evidence of discriminatory motive is sufficient, but if circumstantial evidence is offered, such evidence has to be "specific" and "substantial." *Id.* at 1222; *Little v. Windermere Relocation, Inc.*, 265 F.3d 903, 915 (9th Cir.2001).

■ Plaintiff has produced evidence from which a jury might conclude that some of the reasons Cagle has proffered for discharging Heller were fictitious, and the importance of the other reasons was exaggerated. A jury could infer from this that Cagle was actually motivated, in whole or in part, by an improper purpose such as unlawful discrimination or retaliation. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Heller also testified that, following the single warning in February, she received no guidance on improving her allegedly deficient job performance, and no oral or written warnings, prior to her subsequent discharge. Finally, as discussed earlier, Heller has produced direct evidence of discriminatory animus toward her by the actual decisionmaker, Cagle.

I conclude that Heller has produced sufficient evidence on this claim to go to trial. The same is true of the ORS 659 claim and the common law claim for wrongful discharge (premised upon resistance to discrimination).

### Sufficiency of the Evidence—Discriminatory Termination

■ To prevail on this claim, the plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. In order to prevail, the plaintiff must then demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory. *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1409 (9th Cir.1996). The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or by more direct evidence of discriminatory intent. *Id.* When a plaintiff does not rely exclusively on the presumption but seeks to establish a prima facie case through the submission of actual evidence of discrimination, very little such evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a factfinder. *Schnidrig*, 80 F.3d at 1409.

There is ample direct evidence of discriminatory animus on the part of the [decis]ionmaker, Cagle, and directed at Heller. The Club argues that no inference of discriminatory discharge can be drawn because Strouts, who was discharged at the same time as Heller, is not homosexual. However, there was testimony that Cagle and Gallagher both perceived Strouts as being closely associated with the gay employees, and that closeness was a factor in his termination. *See, e.g.,* Gallagher Depo. at 83 (Strouts is not gay, "but because of his association with [Heller] and working closely with Nick [Doolittle]," Strouts was viewed as being "part of that group"); Cagle Depo. at 50 (when asked why Strouts was fired, responding, *inter alia,* that Strouts "was part of the clique of Liz Heller, Nick and Amanda"); Strouts Depo. at 33, 42–43 (perception that Strouts was in charge of the "fag party crew"). There also is evidence that Strouts actively opposed Cagle's discriminatory behavior, and sought to shield the gay employees from her attacks. Thus, the fact that Strouts

was discharged along with Heller would not compel a jury to conclude that Cagle's motives for discharging Heller were non-discriminatory.[21]

I conclude that plaintiff has produced sufficient evidence to warrant a trial on her claims that she was discharged for reasons prohibited by Title VII.[22]

## RECOMMENDATION

Defendant's eleven-part Motion for Summary Judgment (# 14) should be DENIED and the matter set for trial.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due January 22, 2002. If no objections are filed, the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

January 3, 2002.

---

21. Amanda, an employee perceived as associating with the gay employees, was either discharged or resigned within days after Heller and Strouts were terminated. The other openly gay employee, Nick Doolittle, either resigned or was discharged not long afterwards.

22. Because the issue was not extensively briefed by the parties, I reserve for another day the question of exactly how the racial issues fit into this case. The legal issues are complicated somewhat because the race of Heller's lover was the subject of those alleged remarks. ORS 659.030(a) and (b) expressly make it an unlawful employment practice to discriminate on the basis of either the employee's own race or the race of persons with whom the employee associates. Title VII lacks such express language although, with regard to alleged bias against inter-racial dating, it might be argued that the animus resulted in part from Heller's race, *i.e.,* that Cagle would not have acted as she did had Heller been of the same race as her lover.