In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 02-2529

MICHAEL J. HAMM,

*Plaintiff-Appellant*,

*v.*

WEYAUWEGA MILK PRODUCTS, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-C-1283—**William E. Callahan, Jr.**, *Magistrate Judge.*

---

ARGUED DECEMBER 10, 2003—DECIDED JUNE 13, 2003

---

Before FLAUM, *Chief Judge*, and POSNER and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Michael Hamm alleges that he was sexually harassed at work by his male coworkers and was terminated as a result of his complaints about the harassment in violation of Title VII. The district court concluded that Hamm could not establish that he was discriminated against "because of" sex as required by Title VII and granted summary judgment in favor of Hamm's employer, Weyauwega Milk Products. Because we agree with the district court that Hamm's evidence only supports work performance conflicts or speculation concerning his sexual orientation, we affirm.

## I. BACKGROUND

Michael Hamm, a heterosexual male, began working at Weyauwega Milk Products, a producer of dairy products including cheese, in 1992. Hamm held numerous positions during his employment and his job responsibilities generally included cleaning the equipment and work area, maintaining the supplies, and filling in for other production employees during breaks or days off. Hamm was regarded as a good employee until approximately 1997, when Weyauwega hired a friend of Hamm's, Jeff Zietlow. Beginning in early 1998, Hamm filed a number of complaints with Weyauwega management and with the Wisconsin Equal Rights Division (ERD) alleging harassment by his male coworkers. The Weyauwega plant where Hamm worked was almost entirely male; no women worked in any of the areas of the plant in which Hamm worked.

Hamm filed his first written complaint with Weyauwega management on January 15, 1998, stating that Dean Bohringer, one of Hamm's coworkers, threatened that if Hamm did not do his job properly, then Bohringer would "kick [his] ass to make [him] do so."[1] Hamm also described an incident in the break room in which Bohringer allegedly threw the door open and "started cursing and swearing" at Hamm for failing to replace an empty barrel of cleaning fluid. Hamm further alleged that Bohringer threw the chemical barrel across the room, screamed at him, and told him he should quit. Hamm admits that he yelled back at Bohringer during the incident. Hamm's complaint related another event during which Bohringer yelled at Hamm because, in Hamm's view, Bohringer

---

[1] Many of the comments made in connection with Hamm's complaints contain vulgar and offensive language, but we believe direct quotes of the language used are required in order to accurately describe Hamm's allegations.

believed that he was disrupting equipment and not working quickly enough.

Also, beginning in late 1997, and continuing into 1998, Weyauwega began to have concerns about Hamm's work performance. Many of the complaints about Hamm's work performance by Weyauwega management and Hamm's coworkers centered around their perception that Hamm spent too much time talking to Zietlow and engaging in horseplay. In response to Hamm's initial complaint, Weyauwega instructed Bohringer to "cut down on his swearing when he is mad" and told Hamm to reduce the amount of time he visits with other employees and to more closely follow plant procedures.

During the summer of 1998, Weyauwega documented a number of work errors committed by Hamm including failing to perform his work duties, damaging a milk truck, and spending too much time talking to Zietlow. Weyauwega eventually gave Hamm a final written warning letter dated August 18, 1998 instructing him to 1) stop the horseplay in which he was involved, 2) stop talking to Jeff Zietlow other than for job-related activities, and 3) cooperate with fellow employees and act as a team player.[2]

In September of 1998, Hamm filed his first complaint with the ERD. His complaint alleged that he was called a "faggot," "bisexual," and "girl scout," and that his coworker

---

[2] Beginning in late summer 1998, Hamm also filed a number of reports with Weyauwega police regarding incidents at work or involving work employees. For example, in August 1998, Hamm complained that he was being verbally abused at work, stating that his coworkers were yelling at him, complaining that he was not doing his job, and turning his machines on and off. As similar claims were made in Hamm's complaints to Weyauwega and the ERD, we address these allegations through Hamm's complaints to those organizations.

Dean Bohringer threatened to snap his neck and threw things at him. Hamm also stated he was retaliated against for reporting these incidents to Weyauwega management. In response to Hamm's complaints, Weyauwega set up a meeting between Weyauwega management, Hamm, and Bohringer. During the meeting, Bohringer apologized to Hamm, and Hamm promised to focus on correctly performing his job.

Although exact dates of its genesis are unknown, it is undisputed that during this time a rumor existed among workers at the plant that Hamm and Zietlow's friendship was romantic in nature. Hamm's coworkers thought it odd when Hamm gave Zietlow a boat and let him use his four-wheel vehicle. The sometimes contentious nature of their friendship also drew the attention of coworkers. Hamm called the police department in January 1999 to report that Zietlow, then under age 21, was in a bar drinking and again in February 1999 to report that Zietlow threatened him. Around the same time, Hamm called the police to report that his vehicle had been damaged in the Weyauwega parking lot, and he indicated in his deposition that he believed Zietlow had damaged the vehicle. He also reported that Zietlow had scratched his face. Hamm sued Zietlow in January of 1999 for the return of his four-wheeler, two chain saws, and money that Zietlow had borrowed but not returned. Zietlow was suspended by Weyauwega in early 1999 for striking Hamm's brother, Joe Hamm, also a plant employee, with a pipe. After Zietlow returned to work, Hamm reported that Zietlow soaked him with a water hose. Zietlow was terminated in March of 1999.

Hamm filed his second complaint with Weyauwega on March 24, 1999, claiming that coworker Fred Kivisto accused Hamm of "looking out of the corner of my eyes at him" and had threatened Hamm with a pipe. Hamm also alleged that Kivisto told coworkers that Hamm was

a homosexual and warned them not to bend over in front of him. Kivisto admitted in his deposition that he told Hamm "not to be sizing me up."

Approximately two months later, on May 25, 1999, Hamm filed another complaint with Weyauwega alleging that Mike Fischer, a coworker, and Bohringer were watching him while he worked. He also complained that Weyauwega had not adequately addressed his earlier complaints. Hamm filed a fourth written complaint with Weyauwega on June 7, 1999, claiming that Bohringer yelled obscenities at him, ordering him to get off a forklift. He also repeated his complaint that Kivisto told coworkers not to bend over in front of him.

Weyauwega investigated Hamm's newest complaints. According to Weyauwega, its interviews with Hamm's coworkers revealed that they were frustrated with his inability to complete work tasks correctly and with his instigation of problems and rumors at the plant. During his interview for the investigation, Hamm suggested that Bohringer and Fischer were trying to get him fired.

Hamm also filed a second complaint with the ERD in early June 1999, alleging retaliation by his coworkers for filing his first ERD complaint. Hamm alleged, among other things, that Carl Wodrich, a coworker, and Fischer complained about Hamm's work performance and interfered with his work equipment in retaliation for Hamm's ERD complaint; that Kivisto threatened him with a pipe; that Frank Young, another coworker, threatened to "shove the water hose up [Hamm's] ass" after he was hit with the water from the hose; that management "thought I was 'that way' because they had reason to believe Jeff Zietlow might be 'that way'"; and that "Dean Bohringer stated I was a worthless piece of human flesh and later on shoved me or purposely ran into me in the hallway."

Weyauwega offered Hamm a severance agreement on June 14, 1999, with two and one-half weeks' pay; Hamm

negotiated an increase to seven weeks' pay on June 15, 1999, but left his final approval of the agreement open. Hamm underwent an exit interview reviewing COBRA and 401(k) paperwork, and Hamm cleaned out his locker. Hamm was not scheduled for work again, and he filed a claim for unemployment compensation on June 22, 1999. In a letter dated July 7, 1999, Weyauwega informed Hamm that it regarded him as "voluntary quit" as of July 1, 1999, unless he agreed to an enhanced severance agreement.

On July 9, 1999, Hamm filed a third complaint with the ERD restating his complaints about Bohringer's outburst while Hamm was on the forklift and the comments by Kivisto. He also alleged that he was terminated in retaliation for his complaints.

In September of 2000, Hamm filed suit in federal court, alleging that he was sexually harassed and retaliated against for filing complaints with Weyauwega and with the Wisconsin Equal Rights Division in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* After at least nineteen depositions were taken and discovery was exchanged, Weyauwega moved for summary judgment. The district court granted summary judgment in favor of Weyauwega. Hamm appeals.

## II.  ANALYSIS

We review the district court's decision to grant summary judgment de novo. *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 462 (7th Cir. 2002). Summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue as to any material fact exists, we con-

strue all facts and draw all reasonable inferences in favor of Hamm, the nonmoving party. *See Hilt-Dyson,* 282 F.3d at 462.

### A. Sexual harassment claim

Hamm's claim, that he was sexually harassed by his male coworkers, requires us to navigate the tricky legal waters of male-on-male sex harassment. The protections of Title VII extend to both women and men. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78 (1998) ("Title VII's prohibition of discrimination 'because of . . . sex' protects men as well as women."). Further, sexual harassment claims are not limited to situations in which an individual is harassed by someone of the opposite sex, but may be made in cases such as this one, when same-sex sexual harassment is alleged. *Id.* at 79. The protections of Title VII have not been extended, however, to permit claims of harassment based on an individual's sexual orientation. *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 224 F.3d 701, 704 (7th Cir. 2000). Therefore, in same-sex harassment cases, the central question is whether the harassment occurred "because of the plaintiff's sex." *Id.*

Hamm alleges that his coworkers did not believe he fit the sexual stereotype of a man, and that their sexual stereotyping is evidence of discrimination "because of" sex. *See, e.g.*, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250-52 (1989) (recognizing sex stereotyping as evidence of sex discrimination); *Spearman v. Ford Motor Co.,* 231 F.3d 1080, 1085 (7th Cir. 2000). In order to evaluate Hamm's claim, we must "consider any sexually explicit language or stereotypical statements within the context of all of the evidence of harassment in the case [to] determine whether the evidence as a whole creates a reasonable inference that the plaintiff was discriminated against

because of his sex." *Id.* A careful review of the record in this case leads us to conclude that Hamm has not made a showing sufficient to establish that he was discriminated against "because of" sex.[3] Even drawing all reasonable inferences in Hamm's favor, his litany of complaints about the actions of his coworkers inescapably relate to either Hamm's coworkers' disapproval of his work performance or their perceptions of Hamm's sexual orientation.

Hamm's own characterizations of many of the occurrences underlying his complaint demonstrate that he believed they were related to his job performance. For example, when explaining Bohringer's alleged verbal abuse during his deposition, Hamm surmised that Bohringer swore at him "because apparently he figured I didn't do my job." This rationale is a restatement of Hamm's January 15, 1998 complaint in which he alleged that Bohringer threatened to "put him in a wheelchair" and "snap his neck" and threw a chemical barrel across the room after finding it empty. These incidents, too, are explained by

---

[3] Our analysis focuses on Hamm's need to show he was discriminated against "because of" sex because this appears to be the only element of Hamm's sexual harassment claim contested by Weyauwega. For example, Weyauwega's brief does not discuss important questions such as whether all of the allegedly discriminatory conduct occurred within 300 days of the filing of Hamm's complaint or is properly considered under the continuing violation doctrine, *see Hall v. Bodine Electric Co.,* 276 F.3d 345, 353 (7th Cir. 2002), whether the harassment suffered by Hamm was "sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment," *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67 (1986), or whether Weyauwega acted negligently in responding to Hamm's complaints about his coworkers' conduct, as required to establish its vicarious liability for sexual harassment, *see Hall,* 276 F.3d at 356.

Hamm in terms of his job performance: "I have been subjected to unnecessary verbal abuse from Dean Bohringer on many occasions in the past year, I have been threatened to quit or be killed. . . . He claims I do not do my job, I feel he has no right to threaten me if this is his opinion." Indeed, Hamm concludes the complaint with the observation that: "The company refuses to have any harassment [illegibile] nature cease, it is always ok to be threatened when other employees feel you are not doing your job." Similarly, Hamm alleges that on another occasion Bohringer told him to "Get off that forklift motherfucker. You stupid motherfucker," after Bohringer discovered Hamm on the forklift that Bohringer typically used. Hamm's statements make evident that these complaints related to work-related disputes, more specifically, an apparent belief by Bohringer that Hamm did not perform his job adequately.

Expressions of frustration with Hamm's work performance were not limited to Bohringer. Hamm's June 1999 ERD complaint succinctly explains an episode with Frank Young: "On May 4th Frank Young threatened to shove a water hose up my ass for not doing my job correctly." Hamm also alleges that Mike Fischer tried to force his equipment to malfunction, but also complains that Fischer "made up a story I was not doing my job." Hamm has not produced any evidence to show that these episodes are related to anything other than work-related disputes. *See Spearman,* 231 F.3d at 1085 (use of sexually-explicit insults to express anger at plaintiff over work-related conflicts may be juvenile, but is not sex discrimination).

With respect to the other incidents that Hamm submits as evidence of harassment, all the evidence points to the conclusion that they relate to speculation by his coworkers about his sexual orientation. Again, Hamm's own comments indicate that he perceived the conduct of his cowork-

ers to relate to their belief about his sexual orientation. Hamm admits that his close friendship with Jeff Zietlow was perceived by his coworkers to be romantic in nature. In his first complaint to the ERD, he explained, "Dean Bohringer believes that me and another individual are gay at work, he constantly refers to me and Jeff Zietlow as faggots. Dean has threatened to kill me, snap my neck for what he thinks to be true." In a note written November 12, 1998, and appended to his deposition, Hamm links judgment of his sexuality by his peers to several of his allegations: "I am single so therefore it would more so [be] believed that I was homosexual, I have had numerous people at the plant pick on me on account of this. . . ." His March 24, 1999 complaint contains a similar explanation: "Fred tells me and other people that I am homosexual and not to bend over by me. . . . I am so sick of being threatened for what people perceive!"

In addition to assessing the way in which his coworkers' statements were experienced by Hamm, *see Oncale,* 523 U.S. at 81, we also must consider, as in any sex harassment case, the "social context in which the particular behavior occurs." *Id.* Here it is difficult to separate many of Hamm's complaints from the significant amount of horseplay that occurred at the Weyauwega plant. The district court described the evidence in the record of the horseplay at Weyauwega:

> "Hamm testified that during free time, more specifically, 'every evening and every day,' employees spray each other with water hoses; that someone stuck a bed in the women's locker room as a prank; that Weyauwega employees went into a coworkers' locker and 'labeled his Vaseline jack-off jelly'; and that Bohringer would frequently wrestle/engage in physical horseplay with coworkers during work time. Hamm's brother, Joe Hamm, confirmed that

> horseplay takes place at Weyauwega, including employees spraying each other with water hoses daily and throwing cheese curds at each other numerous times each day."

199 F. Supp.2d 878, 896 n.1 (E.D.Wis. 2002). Hamm admits that even his alleged harassers were the victims of workplace pranks. For example, in his deposition, Hamm described an incident directed at Bohringer in which one of the workers wrote "Dean plus [male name]" all over a door. Hamm himself was disciplined for excessive participation in horseplay at the plant, particularly in his final warning. Of course we do not mean to suggest that the presence of horseplay in a workplace precludes a claim of sexual harassment, but we do recognize that, in some cases, sexually explicit remarks among male coworkers may be "simply expressions of animosity or juvenile provocation." *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997).

Even Hamm's claim that Bohringer referred to him as "girl scout," the strongest factual allegation he makes that his coworkers' actions were linked to his nonconformance to sex stereotypes, does not establish that he was discriminated against because of his sex. In his deposition, Bohringer alleged that he referred to his colleagues with this term indiscriminately, and one of Weyauwega's managers, Dan Stearns, testified that Bohringer had even used the term to refer to him. Hamm acknowledges that Bohringer called other men at the plant "girl scouts," but he calls this fact "immaterial." Bohringer's use of the term to refer to other men, including a supervisor, is hardly immaterial; Hamm cannot point to its use as persuasive evidence that he was treated differently because of his sex when other men at the plant were referred to by the same name. Because there is nothing to suggest that Bohringer viewed the other men at the plant

as nonconforming to sexual stereotypes, his use of the term to describe Hamm cannot support an inference of sex discrimination.[4]

That the conduct complained of by Hamm does not fall within a sexual stereotyping claim cognizable under Title VII is made even more evident by a comparison to the cases in which courts have found such a claim. In *Price Waterhouse*, the plaintiff was a woman passed over for a promotion, and partners in the company remarked that she was "macho," "overcompensated for being a woman," and needed to "walk more femininely, talk more femininely, dress more femininely, wear more make-up, have her hair styled, and wear jewelry." 490 U.S. at 235. In *Doe v. City of Belleville, Illinois*, 119 F.3d 563, 568, 576-77 (7th Cir. 1997), *vacated*, 523 U.S. 1001 (1998), the male plaintiffs' sex was constantly questioned; they were ridiculed for wearing an earring, threatened with sexual assault, and one of the plaintiffs' testicles was grabbed to determine whether he was male or female. In *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 874 (9th Cir. 2001), the male plaintiff was attacked for walking and carrying his tray "like a woman," mocked for not having sexual intercourse with a waitress who was his

---

[4] Other allegations Hamm makes in support of his sex harassment claim do not add up. For instance, Hamm argues that Bohringer called him "kid" and remarked that he had a high-pitched voice. Hamm takes these statements out of context from Bohringer's deposition; Bohringer commented that Hamm's voice was high-pitched when describing how Hamm screamed at him. In another example, Hamm argues that Kivisto threatened to take him to Lake Michigan and leave him at the bottom of the lake. Yet Hamm concedes in his deposition that this incident took place almost five years before he first complained of harassment, and thus it cannot be used to support his claim.

friend, referred to as "she" and "her," and experienced vulgar name-calling cased in female terms. Unlike *Doe* and *Azteca,* where the plaintiffs presented additional evidence that the harassment implicated sex rather than sexual orientation, Hamm's allegations are linked either to his coworkers' perceptions of his work performance or his sexual orientation. *See Oncale*, 523 U.S. at 80 ("[W]orkplace harassment . . . is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations.").

Hamm's case more closely tracks *Spearman v. Ford Motor Co.,* 231 F.3d 1080 (7th Cir. 2000). In that case, Spearman claimed that vulgar and sexually explicit insults directed at him and graffiti posted by his coworkers were motivated by sexual stereotyping, arguing that his coworkers perceived him to be too feminine to fit the masculine image at Ford. *Id.* at 1085. He alleged that a coworker called him a "little bitch," and stated that he hated Spearman's "gay ass," that workplace graffiti linked him with AIDS and labeled him as gay, and that he was assigned duties that he believed should be reserved for women. *Id*. at 1082-84. This court rejected Spearman's claim that this evidence established discrimination because of sex and instead found that the evidence "clearly demonstrates that Spearman's problems resulted from his altercations with coworkers over work issues and because of his apparent homosexuality." *Id.* at 1085. Hamm attempts to distinguish *Spearman* by arguing that the plaintiff in that case was homosexual and he is heterosexual. But we do not focus on the sexuality of the plaintiff in determining whether a Title VII violation has occurred. *See Hondo*, 125 F.3d at 415 ("In the different sex situation, we do not ask a slew of subjective and invasive questions about the sexual orientation of the perpetrator or the victim. We ask whether the treatment meted out created a hostile work environment because the victim was singled

out because of his or her gender."). Indeed, Hamm presents a less difficult case than *Spearman* in that Hamm himself characterizes the harassment of his peers in terms of work-related disputes and perceptions of his sexual orientation and does not link their comments to his sex. Even when construing all facts and drawing all reasonable inferences in Hamm's favor and considering Hamm's coworkers' conduct relating to his job performance in conjunction with their comments regarding his sexual orientation in order to form the fullest picture, Hamm has failed to make a sufficient showing that he was harassed because of his sex.[5]

## B. Retaliation claim

Hamm also alleges that he was terminated by Weyauwega in retaliation for filing complaints of sexual harassment with the company and the ERD. Weyauwega claims that Hamm was not terminated, and that based on his application for unemployment compensation and his

---

[5] We recognize that distinguishing between failure to adhere to sex stereotypes (a sexual stereotyping claim permissible under Title VII) and discrimination based on sexual orientation (a claim not covered by Title VII) may be difficult. This is especially true in cases in which a perception of homosexuality itself may result from an impression of nonconformance with sexual stereotypes. *Doe,* 119 F.3d at 593 ("A homophobic epithet like 'fag' for example, may be as much of a disparagement of a man's perceived effeminate qualities as it is of his perceived sexual orientation. . . . [I]t is not always possible to rigidly compartmentalize the types of bias that these types of epithets represent."). We need not face this difficult problem here because Hamm does not present evidence to establish that the conduct he complains of "was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination because of sex.'" *Oncale*, 523 U.S. at 81.

refusal to respond to the severance agreement, he was properly regarded as "voluntarily quit." We need not resolve this dispute, for even if Hamm was terminated he cannot make out a case for retaliation under Title VII.

Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). In other words, Title VII protects an employee from "retaliation for complaining about the types of discrimination it prohibits." *Miller v. Am. Family Mutual Ins. Co.,* 203 F.3d 997, 1007 (7th Cir. 2000).

Hamm's sexual harassment claim fails because he has not shown that he was discriminated against "because of" sex, as required under Title VII. His retaliation claim was properly decided by the district court for the same reason: his complaints to Weyauwega and the ERD did not concern an employment practice that violated Title VII. *See Hamner,* 224 F.3d at 706-07.

### III.  CONCLUSION

For the forgoing reasons, we AFFIRM the decision of the district court.

POSNER, *Circuit Judge*, concurring.   Judge Williams's opinion is consistent with the cases and the facts, and it reaches a result (denial of liability) that I agree with. I cannot fairly quarrel with the methodological conservatism of her approach. But I think it worth recording my conviction that the case law has gone off the tracks in the matter of "sex stereotyping" and that if it got back

on, this case could be decided on a simpler and more intuitive ground and one that would reduce future litigation.

The case law as it has evolved holds, as Judge Williams explains, that although Title VII does not protect homosexuals from discrimination on the basis of their sexual orientation, it protects heterosexuals who are victims of "sex stereotyping" or "gender stereotyping." *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000) ("the record . . . shows that Spearman's co-workers maligned him because of his apparent homosexuality, and not because of his sex" (so no liability)); *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2001) (if "the harasser was acting to punish the victim's noncompliance with gender stereotypes," then liability); *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 874-75 (9th Cir. 2001) (same); *Schmedding v. Tnemec Co.*, 187 F.3d 862, 865 (8th Cir. 1999) (same) ("although Schmedding concedes that the use [in his complaint] of the phrase 'perceived sexual preference' may have been confusing, he asserts that the phrase indicates or shows that the harassment included rumors that falsely labeled him as homosexual in an effort to debase his masculinity, not that he was harassed because he is homosexual or perceived as being a homosexual").

The origin of this curious distinction, which would be very difficult to explain to a lay person (an indication, often and I think here, that the law is indeed awry), is the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Part of the evidence that the plaintiff in that case had been denied promotion because she was a woman was that her male superiors hadn't liked her failure to conform to their expectations regarding feminine dress and deportment. *Id.* at 235-36. That was indeed a reason to suspect that the firm discriminated against women. But there is a difference that subsequent

cases have ignored between, on the one hand, using evidence of the plaintiff's failure to wear nail polish (or, if the plaintiff is a man, his using nail polish) to show that her sex played a role in the adverse employment action of which she complains, and, on the other hand, creating a subtype of sexual discrimination called "sex stereotyping," as if there were a federally protected right for male workers to wear nail polish and dresses and speak in falsetto and mince about in high heels, or for female ditchdiggers to strip to the waist in hot weather. If a court of appeals requires lawyers presenting oral argument to wear conservative business dress, should a male lawyer have a legal right to argue in drag provided that the court does not believe that he is a homosexual, against whom it is free to discriminate? That seems to me a very strange extension of the *Hopkins* case.

The "logic" of the extension is that if an employer disapproves of conduct by a man that it would not disapprove of in a woman, or conduct by a woman that it would not disapprove of in a man, the disapproval is "because of" sex. What is true, as I have said, is that this asymmetry of response may be evidence of sex discrimination; but to equate it to sex discrimination is a mistake. If an employer refuses to hire unfeminine women, its refusal bears more heavily on women than men, and is therefore discriminatory. That was the *Hopkins* case. But if, as in this case, an employer *whom no woman wants to work for* (at least in the plaintiff's job classification) discriminates against effeminate men, there is no discrimination against men, just against a subclass of men. They are discriminated against not because they are men, but because they are effeminate.

If this analysis is rejected, the absurd conclusion follows that the law protects effeminate men from employment discrimination, but only if they are (or are believed to be) heterosexuals. To impute such a distinction to the

authors of Title VII is to indulge in a most extravagant legal fiction. It is also to saddle the courts with the making of distinctions that are beyond the practical capacity of the litigation process. Hostility to effeminate men and to homosexual men, or to masculine women and to lesbians, will often be indistinguishable as a practical matter, especially the former. Effeminate men often are disliked by other men because they are suspected of being homosexual (though the opposite is also true—effeminate homosexual men may be disliked by heterosexual men because they are effeminate rather than because they are homosexual), while mannish women are disliked by some men because they are suspected of being lesbians and by other men merely because they are not attractive to those men; a further complication is that men are more hostile to male homosexuality than they are to lesbianism. To suppose courts capable of disentangling the motives for disliking the nonstereotypical man or woman is a fantasy.

Inevitably a case such as this impels the employer to try to prove that the plaintiff is a homosexual (the employer's lawyer actually said at the argument that a plaintiff's homosexuality would be a complete defense to a suit of this kind) and the plaintiff to prove that he is a heterosexual, thus turning a Title VII case into an inquiry into individuals' sexual preferences—to what end connected with the policy of the statute I cannot begin to fathom. An unattractive byproduct of the inquiry is a gratuitous disparagement of homosexuals—as when Hamm in his brief, remarking on how "his harassers tormented him with the ultimate attack on his masculinity, namely, barraging him with every vulgar, slang phase for a homosexual," concludes: "*For a heterosexual male*, such slurs are tantamount to verbal castration" (emphasis mine)—as if they were unwounding when directed at a homosexual male.

"Sex stereotyping" should not be regarded as a form of sex discrimination, though it will sometimes, as in the *Hopkins* case, be evidence of sex discrimination. In most cases—emphatically so in a case such as this in which, so far as appears, there are no employees of the other sex in the relevant job classification—the "discrimination" that results from such stereotyping is discrimination among members of the same sex. The distinction can be illustrated by a pair of examples. If the producer of *Antony and Cleopatra* refuses to cast an effeminate man as Antony or a mannish woman as Cleopatra, he is not discriminating against men in the first case and women in the second, although he is catering to the audience's sex stereotypes. But if a fire department refused to hire mannish women to be firefighters, this would be evidence that it was discriminating against women, because mannish women are more likely than stereotypically feminine women to meet the demanding physical criteria for a firefighter.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*