In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1720

KIMBERLY HIVELY,

*Plaintiff-Appellant,*

*v.*

IVY TECH COMMUNITY COLLEGE, South Bend,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:14-cv-1791 — **Rudy Lozano**, *Judge.*

ARGUED SEPTEMBER 30, 2015 — DECIDED JULY 28, 2016

Before BAUER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Once again this court is asked to consider whether Title VII of the Civil Rights Act of 1964 protects employees from or offers redress for discrimination based on sexual orientation. This time, however, we do so in the shadow of a criticism from the Equal Employment Opportunity Commission (EEOC) that this court and others have continued to reflexively declare that sexual orientation is not cognizable under Title VII without due analysis or

consideration of intervening case law. The EEOC's criticism has created a groundswell of questions about the rationale for denying sexual orientation claims while allowing nearly indistinguishable gender non-conformity claims, which courts have long recognized as a form of sex-based discrimination under Title VII. After a careful analysis of our precedent, however, this court must conclude that Kimberly Hively has failed to state a claim under Title VII for sex discrimination; her claim is solely for sexual orientation discrimination which is beyond the scope of the statute. Consequently, we affirm the decision of the district court.

**I.**

Hively began teaching as a part-time adjunct professor at Ivy Tech Community College in 2000. On December 13, 2013, she filed a bare bones pro se charge with the Equal Employment Opportunity Commission (EEOC) claiming that she had been "discriminated against on the basis of sexual orientation" as she had been "blocked from fulltime [sic] employment without just cause," in violation of Title VII. (Short Appendix to Appellant's Brief, 5). After exhausting the procedural requirements in the EEOC, she filed a complaint, again pro se, in the district court alleging that although she had the necessary qualifications for full-time employment and had never received a negative evaluation, the college refused even to interview her for any of the six full-time positions for which she applied between 2009 and 2014, and her part-time employment contract was not renewed in July 2014. In short, she alleged that she had been "[d]enied full time employment and promotions based on sexual orientation" in violation of Title VII, 42 U.S.C. §§ 2000e et seq.

The college's defense in both the district court and on appeal is simply that Title VII does not apply to claims of sexual orientation discrimination and therefore Hively has made a claim for which there is no legal remedy. The district court agreed and granted Ivy Tech's motion to dismiss. *Hively v. Ivy Tech Cmty. Coll.*, No. 3:14-CV-1791, 2015 WL 926015, at *1 (N.D. Ind. Mar. 3, 2015).

## II.

## A.

This panel could make short shrift of its task and affirm the district court opinion by referencing two cases (released two months apart), in which this court held that Title VII offers no protection from nor remedies for sexual orientation discrimination. *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 704 (7th Cir. 2000); *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000). Title VII makes it "unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin" 42 U.S.C. § 2000e-2. This circuit, however, in both *Hamner* and *Spearman*, made clear that "harassment based solely upon a person's sexual preference or orientation (and not on one's sex) is not an unlawful employment practice under Title VII." *Hamner*, 224 F.3d at 704; *Spearman*, 231 F.3d at 1084 (same). Both *Hamner* and *Spearman* relied upon our 1984 holding in *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984) in which this court, while considering the Title VII claim of a transsexual airline pilot, stated in dicta that "homosexuals and transvestites do not enjoy Title VII protection." *Id.* at 1084. In *Ulane*, we came to this conclusion by

considering the ordinary meaning of the word "sex" in Title VII, as enacted by Congress, and by determining that "[t]he phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men." *Id.* at 1085. We also considered the legislative history of Title VII, explaining that it was primarily meant to remedy racial discrimination, with sex discrimination thrown in at the final hour in an attempt to thwart adoption of the Civil Rights Act as a whole. *Id.* Therefore, we concluded, "Congress had a narrow view of sex in mind when it passed the Civil Rights Act." *Id*. at 1086. In a later case describing *Ulane*, we said that at the time of *Ulane* "we were confident that Congress had nothing more than the traditional notion of 'sex' in mind when it voted to outlaw sex discrimination, and that discrimination on the basis of sexual orientation and transsexualism, for example, did not fall within the purview of Title VII." *Doe by Doe v. City of Belleville, Ill.*, 119 F.3d 563, 572 (7th Cir. 1997) (citing *Ulane*, 742 F.2d at 1085–86), *abrogated by Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).[1]

Since *Hamner* and *Spearman*, our circuit has, without exception, relied on those precedents to hold that the Title VII prohibition on discrimination based on "sex" extends only to discrimination based on a person's gender, and not that aimed at a person's sexual orientation. *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 697 (7th Cir. 2014) (citing the holding in *Spearman*, 231 F.3d at 1085); *Hamm v. Weyauwega Milk*

---

[1] See footnote 2 for an explanation of the abrogation by *Oncale*.

*Products, Inc.*, 332 F.3d 1058, 1062 (7th Cir. 2003) ("The protections of Title VII have not been extended, however, to permit claims of harassment based on an individual's sexual orientation."); *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 951 (7th Cir. 2002) ("Title VII does not, however, provide for a private right of action based on sexual orientation discrimination.").

The district court, relying on *Hamner* and two district court cases, thus dismissed Hively's complaint with prejudice. *Hively*, 2015 WL 926015, at *3 (citing *Hamner*, 224 F.3d at 704 ("harassment based solely upon a person's sexual preference or orientation … is not an unlawful employment practice under Title VII."); *Wright v. Porters Restoration, Inc.*, No. 2:09-CV-163-PRC, 2010 WL 2559877, at *4 (N.D. Ind. June 23, 2010) ("To the extent the Plaintiff may be alleging discrimination based on sexual orientation, the Seventh Circuit has unequivocally held that this type of discrimination is not, under any circumstances, proscribed by Title VII."); and *Hamzah v. Woodmans Food Mkt. Inc.*, No. 13-CV-491-WMC, 2014 WL 1207428, at *2 (W.D. Wis. Mar. 24, 2014) ("[t]o the extent [plaintiff] claims harassment due to his heterosexuality—that is, his sexual orientation, not his sex—he cannot bring a Title VII claim against [the defendant] for these alleged instances of harassment, and the court will dismiss that claim with prejudice.")).

We are presumptively bound by our own precedent in *Hamner*, *Spearman*, *Muhammad*, *Hamm*, *Schroeder*, and *Ulane*. "Principles of stare decisis require that we give considerable weight to prior decisions of this court unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a

statutory overruling." *Santos v. United States*, 461 F.3d 886, 891 (7th Cir. 2006). Our precedent has been unequivocal in holding that Title VII does not redress sexual orientation discrimination. That holding is in line with all other circuit courts to have decided or opined about the matter. *See e.g.*, *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006) (perceived sexual orientation and sexual harassment claim); *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1135 (10th Cir. 2005); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 261 (3d Cir. 2001); *Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 751-52 (4th Cir. 1996) (noting in a case of same-sex harassment that Title VII does not protect against discrimination based on sexual orientation); *U.S. Dep't of Hous. & Urban Dev. v. Fed. Labor Relations Auth.*, 964 F.2d 1, 2 (D.C. Cir. 1992) (assuming without deciding that Title VII does not cover sexual orientation discrimination); *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989); *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979); *but see Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1068 (9th Cir. 2002) (gay male employee taunted and harassed by co-workers for having feminine traits successfully pleaded claim of sex harassment under Title VII).

Our holdings and those of other courts reflect the fact that despite multiple efforts, Congress has repeatedly reject-ed legislation that would have extended Title VII to cover sexual orientation.[2] Moreover, Congress has not acted to

---

[2] Employment Non-Discrimination Act of 1994, H.R. 4636, 103rd Cong. (1994); Employment Non-Discrimination Act of 1994, S. 2238, 103rd

amend Title VII even in the face of an abundance of judicial opinions recognizing an emerging consensus that sexual orientation in the workplace can no longer be tolerated. *See, e.g.,* *Vickers*, 453 F.3d at 764-65 ("While the harassment alleged by [the plaintiff] reflects conduct that is socially unacceptable and repugnant to workplace standards of proper treatment and civility, [the plaintiff's] claim does not fit within the

Cong. (1994); Employment Non-Discrimination Act of 1995, H.R. 1863, 104th Cong. (1995); Employment Non-Discrimination Act of 1995, S. 932, 104th Cong. (1995); Employment Non-Discrimination Act of 1996, S. 2056, 104th Cong. (1995); Employment Non-Discrimination Act of 1997, H.R. 1858, 105th Cong. (1997); Employment Non-Discrimination Act of 1997, S. 869, 105th Cong. (1997); Employment Non-Discrimination Act of 1999, H.R. 2355, 106th Cong. (1999); Employment Non-Discrimination Act of 1999, S. 1276, 106th Cong. (1999); Employment Non-Discrimination Act of 2001, H.R. 2692, 107th Cong. (2001); Protecting Civil Rights for all Americans Act of 2001, S. 19, 107th Cong. (2001); Employment Non-Discrimination Act of 2002, S. 1284, 107th Cong. (2002); Equal Rights and Equal Dignity for Americans Act of 2003, S. 16, 108th Cong. (2003); Employment Non-Discrimination Act of 2003, H.R. 3285, 108th Cong. (2003); Employment Non-Discrimination Act of 2003, S. 1705, 108th Cong. (2003); Employment Non-Discrimination Act of 2007, H.R. 2015, 110th Cong. (2007); Employment Non-Discrimination Act of 2007, H.R. 3685, 110th Cong. (2007); Employment Non-Discrimination Act of 2009, H.R. 3017, 111th Cong. (2009); Employment Non-Discrimination Act of 2009, H.R. 2981, 111th Cong. (2009); Employment Non-Discrimination Act of 2009, S. 1584, 111th Cong. (2009); Employment Non-Discrimination Act of 2011, H.R. 1397, 112th Cong. (2011); Employment Non-Discrimination Act of 2011, S. 811, 112th Cong. (2011); Employment Non-Discrimination Act of 2013, H.R. 1755, 113th Cong. (2013); Employment Non-Discrimination Act of 2013, S. 815, 113th Cong. (2013); see also *Ulane*, 742 F.2d at 1085–86 (listing the many failed attempts to amend Title VII to add "sexual orientation" between 1975 and 1982).

prohibitions of the law); *Bibby*, 260 F.3d at 265 ("Harassment on the basis of sexual orientation has no place in our society. Congress has not yet seen fit, however, to provide protection against such harassment."); *Simonton*, 232 F.3d at 35 (harassment on the basis of sexual orientation "is morally reprehensible whenever and in whatever context it occurs, particularly in the modern workplace" but "Congress's refusal to expand the reach of Title VII is strong evidence of congressional intent in the face of consistent judicial decisions refusing to interpret "sex" to include sexual orientation."); *Higgins*, 194 F.3d at 259 (harassment because of sexual orientation "is a noxious practice, deserving of censure and opprobrium" but not proscribed by Title VII); *Rene*, 243 F.3d at 1209, (Hug, J., *dissenting*) (same); *Kay v. Indep. Blue Cross*, 142 F. App'x 48, 51 (3d Cir. 2005) (finding sexual orientation discrimination to be "reprehensible" but not actionable under Title VII); *Silva v. Sifflard*, No. 99-1499, 2000 WL 525573, *1 (1st Cir. Apr. 24, 2000) ("Although we do not condone harassment on the basis of perceived sexual orientation, it is not, without more, actionable under Title VII."); *Christiansen v. Omnicom Grp., Inc.*, No. 15 CIV. 3440, 2016 WL 951581, at *12 (S.D.N.Y. Mar. 9, 2016) (finding the conduct "reprehensible," but not cognizable under Title VII). *See also Ulane*, 742 F.2d at 1084 ("While we do not condone discrimination in any form, we are constrained to hold that Title VII does not protect transsexuals, and that the district court's order on this count therefore must be reversed for lack of jurisdiction."). In short, Congress' failure to act to amend Title VII to include sexual orientation is not from want of knowledge of the problem. And as a result, our understanding in *Ulane* that Congress intended a very narrow reading of the term

"sex" when it passed Title VII of the Civil Rights Act, so far, appears to be correct.

To overcome a motion to dismiss, Hively's complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In this case, Hively fails to thwart the motion to dismiss for the simple reason that this circuit has undeniably declared that claims for sexual orientation are not cognizable under Title VII. Nor are they, without more, cognizable as claims for sex discrimination under the same statute.

**B.**

We could end the discussion there, but we would be remiss not to consider the EEOC's recent decision in which it concluded that "sexual orientation is inherently a 'sex-based consideration,' and an allegation of discrimination based on sexual orientation is necessarily an allegation of sex discrimination under Title VII." *Baldwin v. Foxx*, EEOC Appeal No. 0120133080, 2015 WL 4397641, at *5, *10 (July 16, 2015). The EEOC, the body charged with enforcing Title VII, came to this conclusion for three primary reasons. First, it concluded that "sexual orientation discrimination is sex discrimination because it necessarily entails treating an employee less favorably because of the employee's sex." *Id.* at *5 (proffering the example of a woman who is suspended for placing a photo of her female spouse on her desk, and a man who faces no consequences for the same act). Second, it explained that "sexual orientation discrimination is also sex discrimination because it is associational discrimination on the basis of sex," in which an employer discriminates against lesbian, gay, or bisexual employees based on who they date or mar-

ry. *Id.* at *6-7. Finally, the EEOC described sexual orientation discrimination as a form of discrimination based on gender stereotypes in which employees are harassed or punished for failing to live up to societal norms about appropriate masculine and feminine behaviors, mannerisms, and appearances. *Id.* In coming to these conclusions, the EEOC noted critically that "courts have attempted to distinguish discrimination based on sexual orientation from discrimination based on sex, even while noting that the "borders [between the two classes] are … imprecise." *Id.* at *8 (quoting *Simonton*, 232 F.3d at 35). The EEOC rejected the argument that the plain language of Title VII, along with Congressional inaction, mandated a conclusion that Title VII does not prohibit such discrimination. Instead, the EEOC noted that even the Supreme Court, when applying Title VII's prohibition on "sex" discrimination to same-sex sexual harassment, stated that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale*, 523 U.S. at 79.

This July 2015 EEOC decision is significant in several ways. It marks the first time that the EEOC has issued a ruling stating that claims for sexual orientation discrimination are indeed cognizable under Title VII as a form of sex discrimination. Although the holding in *Baldwin* applies only to federal government employees, its reasoning would be applicable in private employment contexts too. And although the rulings of the EEOC are not binding on this court, they are entitled to some level of deference. *Griggs v. Duke Power Co.*, 401 U.S. 424, 433-34 (1971); *Gibson v. Brown*, 137 F.3d 992, 995-96 (7th Cir. 1998), *vacated*, *W. v. Gibson*, 527 U.S. 212

(1999). Based on our holding today, which is counter to the EEOC's holding in *Baldwin*, we need not delve into a discussion of the level of deference we owe to the EEOC's rulings. Whatever deference we might owe to the EEOC's adjudications, we conclude for the reasons that follow, that Title VII, as it stands, does not reach discrimination based on sexual orientation. Although we affirm our prior precedents on this point, we do so acknowledging that other federal courts are taking heed of the reasoning behind the EEOC decision in *Baldwin*. As we will discuss further below, the district courts, which are the front line experimenters in the laboratories of difficult legal questions, are beginning to question the doctrinaire distinction between gender non-conformity discrimination and sexual orientation discrimination and coming up short on rational answers.

In the process of concluding, after thorough analysis, that allegations of discrimination on the basis of sexual orientation necessarily state a claim of discrimination on the basis of sex, the EEOC criticized courts—and pointed particularly to this circuit—that "simply cite earlier and dated decisions without any additional analysis" even in light of the relevant intervening Supreme Court law. *Baldwin*, 2015 WL 4397641, at *8 n.11. We take to heart the EEOC's criticism of our circuit's lack of recent analysis on the issue. Moreover, recent legal developments and changing workplace norms require a fresh look at the issue of sexual orientation discrimination under Title VII. We begin, therefore, with that intervening Supreme Court case— *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)—and discuss its implication for distinguishing between gender non-conformity claims, which are cognizable under Title VII, and sexual orientation claims, which are not. *See Hamm*, 332 F.3d at 1065 n.5.

## C.

As far back as 1989, the Supreme Court declared that Title VII protects employees who fail to comply with typical gender stereotypes. *Price Waterhouse*, 490 at 251. In *Price Waterhouse*, when Ann Hopkins failed to make partner in the defendant accounting firm, the partners conducting her review advised her that her chances could be improved the next time around if she would, among other gender-based suggestions, "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* at 235. The Supreme Court declared that this type of gender stereotyping constituted discrimination on the basis of sex in violation of Title VII, stating,

> [a]s for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

*Id.* at 251 (internal citations omitted).

The holding in *Price Waterhouse* has allowed many employees to marshal successfully the power of Title VII to state a claim for sex discrimination when they have been discriminated against for failing to live up to various gender norms. *See, e.g.*, *City of Belleville*, 119 F.3d at 580, 582 (finding that a worker who wore an earring and was habitually called

"fag" or "queer" made a sufficient allegation of gender-based discrimination to defeat a motion for summary judgment);[3] *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000) ("the evidence suggests the employer here may have relied on impermissible stereotypes of how women should behave" by criticizing plaintiff's deficient interpersonal skills while tolerating the same deficiencies in male employees.).

As a result of *Price Waterhouse*, a line of cases emerged in which courts began to recognize claims from gay, lesbian, bisexual, and transgender employees who framed their Title VII sex discrimination claims in terms of discrimination based on gender non-conformity (which we also refer to, interchangeably, as sex stereotype discrimination) and not sexual orientation. But these claims tended to be successful only if those employees could carefully cull out the gender non-conformity discrimination from the sexual orientation discrimination. *See Hamm*, 332 F.3d at 1065 (upholding the grant of summary judgment in the employer's favor because the plaintiff "himself characterizes the harassment of his peers in terms of … his sexual orientation and does not link their comments to his sex."). When trying to separate the discrimination based on sexual orientation from that based

---

[3] The Supreme Court's decision in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), nominally abrogated the decision in *City of Belleville*, but nothing in the Supreme Court's decision in *Oncale* called into question this circuit's holding regarding gender stereotypes and application of the *Price Waterhouse* holding. *See Bibby*, 260 F.3d at 263 n.5 ("Absent an explicit statement from the Supreme Court that it is turning its back on *Price Waterhouse*, there is no reason to believe that the remand in *City of Belleville* was intended to call its gender stereotypes holding into question.").

on sex stereotyping, however, courts soon learned that the distinction was elusive. *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 291 (3d Cir. 2009) ("the line between sexual orientation discrimination and discrimination 'because of sex' can be difficult to draw."); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005) ("it is often difficult to discern when [the plaintiff] is alleging that the various adverse employment actions allegedly visited upon her by [her employer] were motivated by animus toward her gender, her appearance, her sexual orientation, or some combination of these" because "the borders [between these classes] are so imprecise."); *Centola v. Potter*, 183 F. Supp. 2d 403, 408 (D. Mass. 2002) ("the line between discrimination because of sexual orientation and discrimination because of sex is hardly clear."); *Hamm*, 332 F.3d at 1065 n.5 ("We recognize that distinguishing between failure to adhere to sex stereotypes (a sexual stereotyping claim permissible under Title VII) and discrimination based on sexual orientation (a claim not covered by Title VII) may be difficult. This is especially true in cases in which a perception of homosexuality itself may result from an impression of nonconformance with sexual stereotypes."); *Id.* at 1067 (Posner, J., concurring) ("Hostility to effeminate men and to homosexual men, or to masculine women and to lesbians, will often be indistinguishable as a practical matter.").

And so for the last quarter century since *Price Waterhouse*, courts have been haphazardly, and with limited success, trying to figure out how to draw the line between gender norm discrimination, which can form the basis of a legal claim under *Price Waterhouse's* interpretation of Title VII, and sexual orientation discrimination, which is not cognizable under Title VII. As one scholar has stated, "The challenge facing

the lower courts since *Price Waterhouse* is finding a way to protect against the entire spectrum of gender stereotyping while scrupulously not protecting against the stereotype that people should be attracted only to those of the opposite gender." Brian Soucek, *Perceived Homosexuals: Looking Gay Enough for Title VII*, 63 AM. U. L. REV. 715, 726 (2014). As we will describe below, courts have gone about this task in different ways—either by disallowing any claims where sexual orientation and gender non-conformity are intertwined, (and, for some courts, by not allowing claims from lesbian, gay, or bisexual employees at all), or by trying to tease apart the two claims and focusing only on the gender stereotype allegations. In both methods, the opinions tend to turn circles around themselves because, in fact, it is exceptionally difficult to distinguish between these two types of claims. Discrimination against gay, lesbian, and bisexual employees comes about because their behavior is seen as failing to comply with the quintessential gender stereotype about what men and women ought to do—for example, that men should have romantic and sexual relationships only with women, and women should have romantic and sexual relationships only with men. In this way, almost all discrimination on the basis of sexual orientation can be traced back to some form of discrimination on the basis of gender non-conformity. Gay men face discrimination if they fail to meet expected gender norms by dressing in a manner considered too effeminate for men, by displaying stereotypical feminine mannerisms and behaviors, by having stereotypically feminine interests, or failing to meet the stereotypes of the rough and tumble man. Co-workers and employers discriminate against lesbian women for displaying the parallel stereotypical male characteristics. But even if those employees display

no physical or cosmetic signs of their sexual orientation, lesbian women and gay men nevertheless fail to conform to gender norm expectations in their attractions to partners of the same sex. Lesbian women and gay men upend our gender paradigms by their very status—causing us to question and casting into doubt antiquated and anachronistic ideas about what roles men and women should play in their relationships. Who is dominant and who is submissive? Who is charged with earning a living and who makes a home? Who is a father and who a mother? In this way the roots of sexual orientation discrimination and gender discrimination wrap around each other inextricably. In response to the new EEOC decision, one court has bluntly declared that the lines are not merely blurry, but are, in fact, un-definable. *See Videckis v. Pepperdine Univ.*, No. CV1500298, 2015 WL 8916764, at *6 (C.D. Cal. Dec. 15, 2015) ("Simply put, the line between sex discrimination and sexual orientation discrimination is 'difficult to draw' because that line does not exist, save as a lingering and faulty judicial construct.") Whether the line is nonexistent or merely exceedingly difficult to find, it is certainly true that the attempt to draw and observe a line between the two types of discrimination results in a jumble of inconsistent precedents.

For example, some courts attempting to differentiate between actions which constitute discrimination on the basis of sexual orientation and those which constitute discrimination on the basis of gender non-conformity essentially throw out the baby with the bathwater. For those courts, if the lines between the two are not easily discernible, the right answer is to forego any effort to tease apart the two claims and simply dismiss the claim under the premise that "a gender stereotyping claim should not be used to bootstrap protection for

sexual orientation into Title VII." *See, e.g.*, *Dawson*, 398 F.3d at 218 (citing *Simonton*, 232 F.3d at 38). In *Dawson*, a lesbian hair salon assistant alleged that she was discriminated against because she did not conform to feminine stereotypes and because she was gay. *Id.* at 217. The court expressed concern that the plaintiff had "significantly conflated her claims," and because the court could not discern whether the allegedly discriminatory acts were motivated by animus toward her gender or her sexual orientation, it deemed the acts beyond the scope of Title VII and upheld the motion for summary judgment in the salon's favor. *Id.* Several other courts likewise have thrown up their hands at the muddled lines between sexual orientation and gender non-conformity claims and simply have disallowed what they deem to be "bootstrapping" of sexual orientation claims onto gender stereotyping claims. For example, in *Vickers*, 453 F.3d at 764, the Sixth Circuit upheld the dismissal of a gender nonconformity claim brought by an employee whose co-workers perceived him to be gay, because recognition of that claim

> would have the effect of de facto amending Title VII to encompass sexual orientation as a prohibited basis for discrimination. In all likelihood, any discrimination based on sexual orientation would be actionable under a sex stereotyping theory if this claim is allowed to stand, as all homosexuals, by definition, fail to conform to traditional gender norms in their sexual practices.

*Id. See also*, *Simonton*, 232 F.3d at 38 (noting that the *Price Waterhouse* theory could not allow plaintiffs to "bootstrap protection for sexual orientation into Title VII because not all

homosexual men are stereotypically feminine, and not all heterosexual men are stereotypically masculine."); *Spearman*, 231 F.3d at 1085-86 (ignoring the plaintiff's claim that he was discriminated against because his co-workers perceived him to be too feminine to fit into the male image of the company, and finding instead that the discriminatory comments were directed solely at the plaintiff's sexual orientation); *Magnusson v. Cty. of Suffolk*, No. 14CV3449, 2016 WL 2889002, at *8 (E.D.N.Y. May 17, 2016) ("Sexual orientation discrimination is not actionable under Title VII, and plaintiffs may not shoehorn what are truly claims of sexual orientation discrimination into Title VII by framing them as claims of discrimination based on gender stereotypes, as Plaintiff at times attempts to do here."); *Burrows v. Coll. of Cent. Florida*, No. 5:14-CV-197-OC-30, 2015 WL 4250427, at *9 (M.D. Fla. July 13, 2015) ("Plaintiff's claim, although cast as a claim for gender stereotype discrimination, is merely a repackaged claim for discrimination based on sexual orientation, which is not cognizable under Title VII."); *Evans v. Georgia Reg'l Hosp.*, No. CV415-103, 2015 WL 5316694, at *3 (S.D. Ga. Sept. 10, 2015) ("Evans' allegations about discrimination in response to maintaining a male visage also do not place her within Title VII's protection zone, even if labeled a 'gender conformity' claim, because it rests on her sexual orientation no matter how it is otherwise characterized."), *report and recommendation adopted*, No. CV415-103, 2015 WL 6555440 (S.D. Ga. Oct. 29, 2015); *Pagan v. Holder*, 741 F. Supp. 2d 687, 695 (D.N.J. 2010) ("This is a hollow attempt to amend the Complaint through briefing and recast a sexual orientation claim as a gender stereotyping claim."), *aff'd, Pagan v. Gonzalez*, 430 F. App'x 170 (3d Cir. 2011).

This line of cases, in which the gender non-conformity claim cannot be tainted with any hint of a claim that the employer also engaged in sexual orientation discrimination, leads to some odd results. As the concurrence in this circuit's decision in *Hamm* pointed out, "the absurd conclusion follows that the law protects effeminate men from employment discrimination, but only if they are (or are believed to be) heterosexuals." *Hamm*, 332 F.3d at 1067 (Posner, J. concurring). And the concurrence was not merely crying wolf. At least one district court has taken the anti-bootstrapping pronouncements in *Dawson* and *Simonton*, *supra* and declared that when determining whether a claim for gender non-conformity can stand, "the critical fact under the circumstances is the actual sexual orientation of the harassed person. If the harassment consists of homophobic slurs directed at a homosexual, then a gender-stereotyping claim by that individual is improper bootstrapping. If, on the other hand, the harassment consists of homophobic slurs directed at a *heterosexual*, then a gender-stereotyping claim by that individual is possible." *Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist., No.*, 715CV0484, 2016 WL 945350, at *8 (N.D.N.Y. Mar. 14, 2016) (internal citations omitted, emphasis in original).[4] In this circuit, however, we have made it clear that "Title VII protects persons, not classes" and that anyone can pursue a claim under Title VII no matter what

---

[4] The plaintiff in *Estate of D.B. by Briggs* brought a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, et seq., but "because a Title IX sex discrimination claim is treated in much the same way as a Title VII sex discrimination claim, Title VII jurisprudence therefore applies." *Estate of D.B.*, 2016 WL 945350, at *8 (citing *Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011)).

her gender or sexual orientation or that of her harasser. *City of Belleville*, 119 F.3d at 574, 575, 588 ("[w]e have never made the viability of sexual harassment claims dependent upon the sexual orientation of the harasser, and we are convinced that it would be both unwise and improper to begin doing so."); *see also Prowel*, 579 F.3d at 289 ("This does not mean, however, that a homosexual individual is barred from bringing a *sex discrimination* claim under Title VII, which plainly prohibits discrimination "because of sex."). Our intuition was confirmed by the Supreme court in *Oncale*, which held that same-sex sexual harassment does not depend on the sexual orientation of the harasser. *Oncale*, 523 U.S. at 80 ("harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.") It is hard to reconcile the holding in *Oncale* with a legal theory that only non-gay plaintiffs can have a viable claim for gender non-conformity discrimination under Title VII. And in this circuit, at least, it is clear that "we do not focus on the sexuality of the plaintiff in determining whether a Title VII violation has occurred." *Hamm*, 332 F.3d at 1065.

Other courts address the problem of the ill-defined lines between sexual orientation and gender non-conformity claims by carefully trying to tease the two apart and looking only at those portions of the claim that appear to address cognizable gender non-conformity discrimination.[5] *See, e.g.*

---

[5] Some of these courts go half a step further and articulate that the sexual orientation claim has no effect whatsoever on the gender non-conformity claim. *See Rene,* 305 F.3d at 1063 ("an employee's sexual orientation is irrelevant for purposes of Title VII. It neither provides nor precludes a cause of action for sexual harassment."); *Centola*, 183 F. Supp. 2d at 409-10 ("Centola does not need to allege that he suffered discrimination on

*EEOC v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 457-59 (5th Cir. 2013) (sustaining a jury verdict finding sex discrimination by emphasizing the very specific testimony isolating gender-based discrimination from sexual orientation). But because of the indeterminate boundaries, one is left to wonder whether the court has, in fact successfully separated the two claims. For example, in *Prowel*, a factory worker who described himself both as gay and effeminate succeeded in defeating summary judgment by proffering just enough evidence of harassment based on gender stereotypes, as opposed to that based on sexual orientation, to satisfy the court that the claim might succeed. *Id*. 579 F.3d 291-92. Notably, Prowel succeeded because he convinced the court that he displayed stereotypically feminine characteristics by testifying that he had a high voice, did not curse, was well-groomed, neat, filed his nails, crossed his legs, talked about art and interior design, and pushed the buttons on his factory equipment "with pizzazz." *Id*. The Third Circuit concluded that a jury could find that "Prowel was harassed because he did not conform to [his employer's] vision of how a man should look, speak, and act-rather than harassment based solely on his sexual orientation." *Id.* at 292. But it is not at all clear that the court successfully segregated characteristics based on sexual orientation from those based on gender, or if such a task is even possible. Having a high voice and an in-

the basis of his sex alone or that sexual orientation played no part in his treatment … if Centola can demonstrate that he was discriminated against 'because of … sex' as a result of sex stereotyping, the fact that he was also discriminated against on the basis of his sexual orientation has no legal significance under Title VII.").

terest in grooming, art, interior design and civil language, are not merely attributes associated with women, but also attributes stereotypically associated with gay men. So for purposes of Title VII, should a court deem that pushing a factory button "with pizzazz" is a trait associated with gay men or straight women? It is difficult to know. We can assume that the vast majority of the stereotypes of gay men have come about particularly because they are associated with feminine attributes. The attempts to identify behaviors that are uniquely attributable to gay men and lesbians often lead to strange discussions of sexual orientation stereotypes. For example, one district court concluded that mimicking a gay co-worker with a lisp and "flamboyant" voice is discrimination based solely on sexual orientation and not gender. *Anderson v. Napolitano*, No. 09-60744-CIV, 2010 WL 431898, at *6 (S.D. Fla. Feb. 8, 2010). "[T]he logical conclusion is that his coworkers were lisping because of the stereotype that gay men speak with a lisp. Lisping is not a stereotype associated with women. Thus, again, the coworkers' actions were not "because of sex," but because of Anderson's sexual orientation" *Id.*

Nevertheless, although disentangling gender discrimination from sexual orientation discrimination may be difficult, we cannot conclude that it is impossible. There may indeed be some aspects of a worker's sexual orientation that create a target for discrimination apart from any issues related to gender. Harassment may be based on prejudicial or stereotypical ideas about particular aspects of the gay and lesbian "lifestyle," including ideas about promiscuity, religious beliefs, spending habits, child-rearing, sexual practices, or politics. Although it seems likely that most of the causes of discrimination based on sexual orientation ultimately stem

from employers' and co-workers' discomfort with a lesbian woman's or a gay man's failure to abide by gender norms, we cannot say that it must be so in all cases. Therefore we cannot conclude that the two must necessarily be co-extensive unless or until either the legislature or the Supreme Court says it is so.

Because we recognize that Title VII in its current iteration does not recognize any claims for sexual orientation discrimination, this court must continue to extricate the gender non-conformity claims from the sexual orientation claims. We recognize that doing so creates an uncomfortable result in which the more visibly and stereotypically gay or lesbian a plaintiff is in mannerisms, appearance, and behavior, and the more the plaintiff exhibits those behaviors and mannerisms at work, the more likely a court is to recognize a claim of gender non-conformity which will be cognizable under Title VII as sex discrimination. *See, e.g.*, *Rene*, 305 F.3d at 1068 (gay male employee taunted and harassed by co-workers for having feminine traits successfully pleaded claim of sex discrimination under Title VII); *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 874-75 (9th Cir. 2001) (noting that the abuse directed at plaintiff reflected a belief that he did not act as a man should act—he had feminine mannerisms, did not have sex with a female friend, and did not otherwise conform to gender-based stereotypes—and thus the discrimination was closely linked to gender and therefore actionable under Title VII); *Reed v. S. Bend Nights, Inc.*, 128 F. Supp. 3d 996, 1001 (E.D. Mich. 2015) (lesbian employee "put forth sufficient evidence in support of her allegation that she was discriminated against because she did not conform to traditional gender stereotypes in terms of her appearance, behavior, or mannerisms at work," where her supervisor testified that

she "dressed more like a male" and her "'demeanor' was a 'little more mannish.'"); *Koren v. Ohio Bell Tel. Co.*, 894 F. Supp. 2d 1032, 1038 (N.D. Ohio 2012) (gay man alleged sufficient facts to support a claim of sex discrimination based on his failure to comply with gender norms where he changed his last name to his husband's and his employer refused to call him by his new name); *Centola*, 183 F. Supp. 2d at 410 (concluding that plaintiff's coworkers must have surmised that the plaintiff was gay because they found him to be effeminate); *Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212, 1217-20 (D. Or. 2002) (holding that a jury could find that the employer repeatedly harassed, and ultimately discharged, the plaintiff because she did not conform to the employer's stereotype of how a woman ought to behave, both because she dated other women and because she wore male-styled clothing).

Plaintiffs who do not look, act, or appear to be gender non-conforming but are merely known to be or perceived to be gay or lesbian do not fare as well in the federal courts. In a Sixth Circuit case, for example, the plaintiff, who was not openly gay and, in fact, even in the lawsuit "declined to reveal whether or not he [was], in fact, homosexual" could not defeat a motion to dismiss his Title VII claim because

> the gender non-conforming behavior which Vickers claims supports his theory of sex stereotyping is not behavior observed at work or affecting his job performance. Vickers has made no argument that his appearance or mannerisms on the job were perceived as gender nonconforming in some way and provided the basis for the harassment he experienced. Rather,

the harassment of which Vickers complains is more properly viewed as harassment based on Vickers' perceived homosexuality, rather than based on gender non-conformity.

*Vickers*, 453 F.3d at 763.

Likewise, in *Bibby*, 260 F.3d at 264, the Third Circuit granted summary judgment against the plaintiff where he "did not claim that he was harassed because he failed to comply with societal stereotypes of how men ought to appear or behave or that as a man he was treated differently than female co-workers. His claim was, pure and simple, that he was discriminated against because of his sexual orientation." *Id. See also Hamm,* 332 F.3d at 1063-64 (Hamm's claim could not survive a motion for summary judgment where his claim was based on speculation by co-workers that he was gay rather than any specifically alleged gender non-conforming attributes); *Hamner*, 224 F.3d at 705 (upholding judgment as a matter of law for the employer where the plaintiff's discrimination claim was based only on the fact that his employer knew his status as a gay man and "absolutely could not handle that"); *Johnson v. Hondo, Inc.*, 125 F.3d 408, 413-14 (7th Cir. 1997) (concluding that a slew of gay epithets could not sustain a claim of gender discrimination where there was no evidence that the plaintiff failed to conform to male stereotypes); *Simonton*, 232 F.3d at 38 (holding that a plaintiff could not defeat a motion to dismiss based on a gender non-conformity claim under Title VII where he never set forth any claim that he "behaved in a stereotypically feminine manner."); *Pambianchi v. Arkansas Tech Univ.*, 95 F. Supp. 3d 1101, 1114 (E.D. Ark. 2015) ("Sexual orientation alone cannot be the alleged gender non-

conforming behavior that gives rise to an actionable Title VII claim under a sex-stereotyping theory."). *But see Boutillier v. Hartford Pub. Sch.*, No. 3:13CV1303, 2014 WL 4794527, *2 (D. Ct. Sept. 25, 2014) (allowing claim of lesbian teacher to go forward where the only evidence of gender non-conformity was the fact that she was openly married to a woman because "[c]onstrued most broadly, she has set forth a plausible claim she was discriminated against based on her non-conforming gender behavior."); *Terveer v. Billington*, 34 F. Supp. 3d 100, 116 (D.D.C. 2014) (the plaintiff defeated the summary judgment motion by alleging that the defendant denied him promotions and created a hostile work environment because of the plaintiff's failure to conform to male sex stereotypes solely because of his status as a gay man.); *Centola*, 183 F. Supp. at 410 ("Conceivably, a plaintiff who is perceived by his harassers as stereotypically masculine in every way except for his actual or perceived sexual orientation could maintain a Title VII cause of action alleging sexual harassment because of his sex due to his failure to conform with sexual stereotypes about what 'real' men do or don't do.")

In sum, the distinction between gender non-conformity claims and sexual orientation claims has created an odd state of affairs in the law in which Title VII protects gay, lesbian, and bisexual people, but frequently only to the extent that those plaintiffs meet society's stereotypical norms about how gay men or lesbian women look or act—i.e. that gay men tend to behave in effeminate ways and lesbian women have masculine mannerisms. By contrast, lesbian, gay or bisexual people who otherwise conform to gender stereotyped norms in dress and mannerisms mostly lose their claims for sex discrimination under Title VII, although why this should be

true is not entirely clear. It is true that "not all homosexual men are stereotypically feminine and not all heterosexual men are stereotypically masculine" as the Second Circuit explained while defending the exclusion of sexual orientation protection under Title VII. *Simonton*, 232 F.3d at 38. But it is also true, as we pointed out above, that all gay, lesbian and bisexual persons fail to comply with the sine qua non of gender stereotypes—that all men should form intimate relationships only with women, and all women should form intimate relationships only with men.

Because courts have long held that Title VII will not support a claim for sexual orientation discrimination per se, many courts have been attempting to dress sexual orientation discrimination claims in the garb of gender non-conformity case law, with the unsatisfactory results seen in the confused hodge-podge of cases we detail above. This has led some courts toward a more blunt recognition of the difficulty of extricating sexual orientation claims from gender non-conformity claims. Thus the *Videckis* court's observation, which noted that "[s]imply put, the line between sex discrimination and sexual orientation discrimination is 'difficult to draw' because that line does not exist, save as a lingering and faulty judicial construct." *Videckis*, 2015 WL 8916764, at *5. This court long ago noted the difficulty and began to grapple with it in a case involving same-sex sexual harassment:

> There is, of course, a considerable overlap in the origins of sex discrimination and homophobia, and so it is not surprising that sexist and homophobic epithets often go hand in hand. Indeed, a homophobic epithet like "fag,"

> for example, may be as much of a disparage-
> ment of a man's perceived effeminate qualities
> as it is of his perceived sexual orientation. Ob-
> servations in this vein have led a number of
> scholars to conclude that anti-gay bias should,
> in fact, be understood as a form of sex discrim-
> ination.

*City of Belleville*, 119 F.3d at 593. We had no need to decide the matter directly in that case because we were satisfied that there was adequate proof that the harassment recounted by the plaintiff was animated by his failure to conform to stereotypic gender norms. *Id.* at 575 ("One may reasonably infer from the evidence before us that [the plaintiff] was harassed 'because of' his gender. If that cannot be inferred from the sexual character of the harassment itself, it can be inferred from the harassers' evident belief that in wearing an earring, [the plaintiff] did not conform to male standards."). Nevertheless, by noting the overlay between anti-gay bias and sex discrimination we seemed to have anticipated the EEOC's path in *Baldwin*, 2015 WL 4397641, at *10.

Likewise, the Sixth Circuit was on to something when it said, "In all likelihood, any discrimination based on sexual orientation would be actionable under a sex stereotyping theory if this claim is allowed to stand, as all homosexuals, by definition, fail to conform to traditional gender norms in their sexual practices." *Vickers*, 453 F.3d at 764. The *Vickers* court thought the solution to the inability to segregate sexual orientation from gender non-conformity claims was to deny all gender non-conformity claims where there was also a claim of sexual orientation discrimination. But the other approach could be to recognize the fact that sexual orientation

discrimination is, in fact, discrimination based on the gender stereotype that men should have sex only with women and women should have sex only with men. "Conceivably, a plaintiff who is perceived by his harassers as stereotypically masculine in every way except for his actual or perceived sexual orientation could maintain a Title VII cause of action alleging sexual harassment because of his sex due to his failure to conform with sexual stereotypes about what 'real' men do or don't do." *Centola*, 183 F. Supp. 2d at 410. As the next paragraph explains, with increasing frequency, the lower courts are beginning to see the false distinction and are turning to this latter approach.

The idea that the line between gender non-conformity and sexual orientation claims is arbitrary and unhelpful has been smoldering for some time, but the EEOC's decision in *Baldwin* threw fuel on the flames. Since the EEOC released its decision in *Baldwin*, stating that "allegations of discrimination on the basis of sexual orientation necessarily state a claim of discrimination on the basis of sex," *Baldwin*, 2015 WL 4397641, at *10, more and more district court judges have begun to scratch their heads and wonder whether the distinction between the two claims does indeed make any sense. For example, a district court in the Southern District of New York, noting the holding of *Baldwin*, the changing legal landscape, and the arbitrariness of distinguishing between gender based discrimination and sexual orientation discrimination, stated:

> The lesson imparted by the body of Title VII litigation concerning sexual orientation discrimination and sexual stereotyping seems to be that no coherent line can be drawn between

> these two sorts of claims. Yet the prevailing
> law in this Circuit—and, indeed, every Circuit
> to consider the question—is that such a line
> must be drawn. *Simonton* is still good law, and,
> as such, this Court is bound by its dictates.

*Christiansen*, 2016 WL 951581, at \*14 ("Title VII does not proscribe discrimination because of sexual orientation") (citing *Simonton*, 232 F.3d at 36). And as we just noted above, the Eastern District of Virginia has concluded that

> the distinction [between sexual orientation discrimination and gender discrimination] is illusory and artificial, and that sexual orientation discrimination is not a category distinct from sex or gender discrimination. Thus, claims of discrimination based on sexual orientation are covered by Title VII and Title IX, but not as a category of independent claims separate from sex and gender stereotype. Rather, claims of sexual orientation discrimination are gender stereotype or sex discrimination claims.

*Videckis*, 2015 WL 8916764, at \*5. Likewise, several other district courts have indicated their agreement with the EEOC's decision in *Baldwin,* or, at least recognized that the blurring line between gender and sexual orientation claims might require courts to reconsider the long line of precedent distinguishing them. *Isaacs v. Felder Servs., LLC*, 143 F. Supp. 3d 1190, 1193 (M.D. Ala. 2015) ("This court agrees instead with the view of the Equal Employment Opportunity Commission that claims of sexual orientation-based discrimination are cognizable under Title VII."); *Koke v. Baumgardner*, No. 15-CV-9673, 2016 WL 93094, at \*2 (S.D.N.Y. Jan. 5, 2016)

("Given the door left ajar by *Simonton* for claims based on 'failure to conform to sex stereotypes,' the EEOC's recent holding that Title VII prohibits discrimination on the basis of sexual orientation, and the lack of a Supreme Court ruling on whether Title VII applies to such claims, I cannot conclude, at least at this stage, that plaintiff's Title VII claim is "wholly insubstantial and frivolous.").

In short, the district courts—the laboratories on which the Supreme Court relies to work through cutting-edge legal problems—are beginning to ask whether the sexual orientation-denying emperor of Title VII has no clothes. *See Arizona v. Evans*, 514 U.S. 1, 23, n.1 (1995) (Ginsburg, J. dissenting) (1995) ("We have in many instances recognized that when frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by this Court.")

While this eddy of statutory Title VII sexual orientation decisions has been turning in the lower federal courts, the Supreme Court has been expounding upon the rights of lesbian, gay, and bisexual persons in a constitutional context. Of course, these constitutional cases have no direct bearing on the outcome of litigation under Title VII of the Civil Rights Act, but they do inform the legal landscape that courts face as they interpret "because of sex" in Title VII. In 1996 in *Romer v. Evans*, 517 U.S. 620 (1996), for example, the Court invalidated, under the Equal Protection Clause, an amendment to Colorado's Constitution that sought to foreclose any branch or political subdivision of the State from protecting persons against discrimination based on sexual orientation. Next, in *Lawrence v. Texas*, the Court determined

that individuals' rights to liberty under the Due Process Clause gives them the full right to engage in private consensual sexual conduct without intervention of the government. *Id.*, 539 U.S. at 578 (2003). Then, in 2013, the Supreme Court struck down the Defense of Marriage Act (DOMA), finding that it violated the equal protection guarantee of the Fifth Amendment. *United States v. Windsor*, 133 S. Ct. 2675 (2013). And finally, two years later, the Supreme Court ruled that under both the Due Process and Equal Protection Clauses of the Fourteenth Amendment, same-sex couples had the right to marry in every state of the Union. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2696 (2015). We emphasize yet again that none of these cases directly impacts the statutory interpretations of Title VII. The Supreme Court neither created Title VII nor was required to address any issues regarding employment discrimination in considering the issues it chose to address. The role of the Supreme Court is to interpret the laws passed by Congress. And, in fact, in *Obergefell*, one amicus brief urged the Court to view the same sex marriage debate through the lens of gender discrimination arguing that the state's permission to marry depends on the gender of the participants. *Brief Amicus Curiae of Legal Scholars Stephen Clark, Andrew Koppelman, Sanford Levinson, Irina Manta, Erin Sheley and Ilya Somin, Obergefell v. Hodges*, 2015 WL 1048436, *4 (U.S. 2015). In oral arguments Chief Justice John Roberts delved into this realm of questioning wondering whether "if Sue loves Joe and Tom loves Joe, Sue can marry him and Tom can't. And the difference is based upon their different sex. Why isn't that a straightforward question of sexual discrimination?" Transcript of oral argument at 62:1-4 *Obergefell*, 135 S. Ct. at 2584. But despite having considered this option, the Court rejected it for a holding based in the Four-

teenth Amendment. The Court did not address the issue of gender nor of workplace discrimination.

The cases as they stand do, however, create a paradoxical legal landscape in which a person can be married on Saturday and then fired on Monday for just that act. For although federal law now guarantees anyone the right to marry another person of the same gender, Title VII, to the extent it does not reach sexual orientation discrimination, also allows employers to fire that employee for doing so. From an employee's perspective, the right to marriage might not feel like a real right if she can be fired for exercising it. Many citizens would be surprised to learn that under federal law any private employer can summon an employee into his office and state, "You are a hard-working employee and have added much value to my company, but I am firing you because you are gay." And the employee would have no recourse whatsoever—unless she happens to live in a state or locality with an anti-discrimination statute that includes sexual orientation. More than half of the United States, however, do not have such state protections: Alabama, Alaska, Arkansas, Arizona, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Virginia, West Virginia, and Wyoming.[6] Moreover,

---

[6] States with laws that prohibit sexual orientation discrimination in employment: *California*: Ca. Gov't. Code §§ 12920, 12940, 12926 & 12949; *Colorado*: Colo Rev. Stat. § 24-34-401, et seq.; *Connecticut*: Conn. Gen. Stat. sec. 46a-81c(1); *Delaware*: 19 Del. C. § 711; *Hawaii*: Haw. Rev. Stat. Ann. §§ 368-1, 378-2; *Illinois*: 775 ILCS 5/1-103 & 775 ILCS 5/1-102; *Iowa*: Iowa Code Ann. 216.2(14), 216.6; *Maine*: Me. Rev. Stat. Tit. 5 § 4571, § 4572, §

the truth of this scenario would also apply to perceived sexual orientation. And so, for example, an employer who merely has a hunch that an employee is gay can terminate that employee for being gay whether or not she actually is. And even if the employer is wrong about the sexual orientation of the non-gay employee, the employee has no recourse under Title VII as the discharge still would be based on sexual orientation.

In one sense, the paradox is not our concern. Our task is to interpret Title VII as drafted by Congress, and as we concluded in *Ulane*, Title VII prohibits discrimination only on the basis of gender. *Id.*, 742 F.2d at 1085. If we, and every

4553 9-C; *Maryland*: Md. Code Ann., State Gov't § 20-606; *Massachusetts*: Mass. Gen. Laws Ch. 151B, § 3(6), § 4; *Minnesota*: Minn. Stat. Ann. § 363A.02, § 363A.08; *Nevada*: Nev. Rev. Stat. Ann. §§ 613.330, 610.185, 613.340, 613.405, & 338.125; *New Hampshire*: N.H. Rev. Stat. Ann. §§ 354-A:6, 354-A:7; *New Jersey*: N.J. Stat. §§ 10:5-3, 10:5-4, 10:5-12; *New Mexico*: N.M. Stat. §28-1-7; *New York:* N.Y. Exec. Law § 296; *Oregon*: Or. Rev. Stat. Ann. § 659A.030; *Rhode Island*: 28 R.I. Gen. Laws §§ 28-5-5, 28-5-7; *Utah*: Utah Code Ann. § 34A-5-106; *Vermont*: Vt. Stat. Ann. tit. 21, § 495; *Washington*: Wash. Rev. Code Ann. §§ 49.60.030 49.60.010, 49.60.040; *Wisconsin*: Wis. Stat. Ann. §§ 111.31, 111.36, 111.325.

The following states have sexual-orientation discrimination protections for government employees only, but not private employees: *Alaska*: Alaska Admin. Order 195; *Arizona*:  Executive Order 2003-22; *Indiana*: Indiana Governor Mitch Daniel's Policy statement of 4-26-05; *Kentucky*: Kentucky Executive Order 2003-533; *Louisiana*: Executive Order No. JBE 2016 – 11, Governor of Louisiana, 13 April 2016; *Michigan*: Michigan Executive Directive, No. 2003-24; *Missouri:* Executive Order 10-24; *Montana*: Montana Executive Order No. 41-2008; *North Carolina:* Executive Order 93 (2016); *Ohio*: Executive Order 2011-05K; *Pennsylvania*: Executive Order No. 2003-10; *Virginia:* Executive Order 1 (2014).

other circuit to have considered it are wrong about the interpretation of the boundaries of gender discrimination under the "sex" prong of Title VII, perhaps it is time for the Supreme Court to step in and tell us so.

As things stand now, however, our understanding of Title VII leaves us with a somewhat odd body of case law that protects a lesbian who faces discrimination because she fails to meet some superficial gender norms—wearing pants instead of dresses, having short hair, not wearing make up—but not a lesbian who meets cosmetic gender norms, but violates the most essential of gender stereotypes by marrying another woman. We are left with a body of law that values the wearing of pants and earrings over marriage. It seems likely that neither the proponents nor the opponents of protecting employees from sexual orientation discrimination would be satisfied with a body of case law that protects "flamboyant" gay men and "butch" lesbians but not the lesbian or gay employee who act and appear straight. This type of gerrymandering to exclude some forms of gender-norm discrimination but not others leads to unsatisfying results.

**D.**

In addition to the inconsistent application of Title VII to gender non-conformity, these sexual orientation cases highlight another inconsistency in courts' applications of Title VII to sex as opposed to race. As the EEOC noted in *Baldwin*, when applying Title VII's prohibition of race discrimination, courts and the Commission have consistently concluded that the statute prohibits discrimination based on an employee's association with a person of another race, such as an interracial marriage or friendship. *Baldwin*, 2015 WL 4397641, at *6. But although it has long been clear that Title VII protects

white workers who are discriminated against because they have close associations with African-American partners and vice versa, it has not protected women employees who are discriminated against because of their intimate associations with other women, and men with men.

Since the earliest days of Title VII, the EEOC has taken the position that Title VII, in proscribing race-based discrimination, includes a prohibition on discrimination toward employees because of their interracial associations. *See, e.g., Equal Employment Opportunity Comm'n*, EEOC Dec. No. 76-23 (1975) (Title VII claim properly alleged where job applicant not hired due to his white sister's domestic partnership with an African American). The courts that have considered this question agree: Title VII protects employees in interracial relationships. That is to say, courts have concluded that if a white employee is fired because she is dating or married to an African-American man, this constitutes discrimination on the basis of race. Had she been in a relationship with a white man, she would not have faced the same consequences. The rationale is that "where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's own race." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (plaintiff claiming that he suffered an adverse employment action because of his interracial marriage has alleged discrimination as a result of his membership in a protected class under Title VII); *See also Floyd v. Amite Cty. Sch. Dist.*, 581 F.3d 244, 249 (5th Cir. 2009) (collecting cases); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 589 (5th Cir. 1998) (white woman dating African-American man), *reh'g en banc granted, opinion vacated on other grounds, Williams v. Wal-Mart Stores, Inc.*, 169 F.3d 215 (5th Cir. 1999),

*and opinion reinstated on reh'g, Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999); *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 884 (7th Cir. 1998) (declining to decide whether an employee who advised and counseled African-American co-workers could bring an associational race discrimination claim under Title VII, as it was conceded by the defendant, but noting that other courts have determined that such a claim is available when factually supported); *Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1327 n. 6 (8th Cir. 1994) (agreeing with district court that claim for discrimination based on interracial relationships was cognizable under Title VII, but finding that plaintiff failed to present sufficient evidence to support the claim); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 891–92 (11th Cir. 1986) (white man married to African-American woman can state a claim for failure to hire under Title VII); *Whitney v. Greater N.Y. Corp. of Seventh–Day Adventists*, 401 F. Supp. 1363, 1366 (S.D.N.Y.1975) (white woman alleged viable claim of discrimination based on casual social relationship with African-American man); *Gresham v. Waffle House, Inc.*, 586 F. Supp. 1442, 1445 (N.D.Ga. 1984) (holding that plaintiff has stated a claim under Title VII by alleging that she was discharged by her employer because of her interracial marriage to a black man).

The relationship in play need not be a marriage to be protected. A number of courts have found that Title VII protects those who have been discriminated against based on interracial friendships and other associations. *See, e.g., Blanks v. Lockheed Martin Corp.*, 568 F. Supp. 2d 740, 744 (S.D. Miss. 2007) (compiling cases in which courts have found viable claims under Title VII where plaintiffs alleged discrimination based on workplace or other associations with members

of racial and national origin minority groups); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1118 (9th Cir. 2004) (noting that a white employee who was also targeted for discrimination was not a good comparator to plaintiff as he was targeted because of his close associations with black friends and co-workers); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 574 (6th Cir. 2000) (advocacy on behalf of women and minorities); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999) ("A white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for the discrimination is a prejudice against the biracial child"); *Drake*, 134 F.3d at 884 (advising and counseling African-American co-workers); *Stacks*, 27 F.3d at 1327 (professional relationship with African-American co-worker); *Whitney*, 401 F. Supp. at 1366 (casual social relationship with African-American).

It is also well established that, unlike equal protection claims that apply differing levels of scrutiny depending on the nature of the class, the classifications within Title VII—race, color, religion, sex, or national origin—must all be treated equally. "The statute on its face treats each of the enumerated categories exactly the same." *Price Waterhouse*, 490 U.S. at 244 n. 9. *See also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n. 10 (2002) ("Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."). Consequently, if Title VII protects from discrimination a white woman who is fired for romantically associating with an African-American man, then logically it should also protect a woman who has been discriminated against because she is associating romantically with another woman, if the

same discrimination would not have occurred were she sexually or romantically involved with a man. It is true that Hively has not made the express claim that she was discriminated against based on her relationship with a woman, but that is, after all, the very essence of sexual orientation discrimination. It is discrimination based on the nature of an associational relationship—in this case, one based on gender.

**E.**

A court would not necessarily need to expand the definition of "sex discrimination" beyond the narrow understanding of "sex" we adopted in *Ulane,* to conclude that lesbian, gay, and bisexual employees who are terminated for their sexual conduct or their perceived sexual conduct have been discriminated against on the basis of sex. Yet, by failing to conform with both superficial and quintessential gender norms, gay, lesbian, and bisexual employees could be seen as facing discrimination comparable to that which Ann Hopkins faced when her supervisors insisted that she live up to the feminine stereotype the supervisors associated with women. "Congress intended to strike at the *entire* spectrum of disparate treatment of men and women resulting from sex stereotypes." *Price Waterhouse*, 490 U.S. at 251 (emphasis ours). There is no reason to believe that the disparate treatment caused when employees do not live up to the stereotype of how "real" men and women act in their sexual lives should be excluded. As the Supreme Court stated in *Oncale*, "Statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. *Oncale*, 523 U.S. 75 at 79.

Curiously, however, despite *Price Waterhouse* and *Oncale*, the Supreme Court has opted not to weigh in on the question of whether Title VII's prohibition on sex-based discrimination would extend to protect against sexual orientation discrimination. Even in the watershed case of *Obergefell*, when the Court declared that "laws excluding same-sex couples from the marriage right impose stigma and injury of the kind prohibited by our basic charter," it made no mention of the stigma and injury that comes from excluding lesbian, gay, and bisexual persons from the workforce or subjecting them to un-remediable harassment and discrimination. *Obergefell*, 135 S. Ct. at 2602. Perhaps the majority's statement in *Obergefell* that "[i]t demeans gays and lesbians for the State to lock them out of a central institution of the Nation's society" could be read as a forecast that the Supreme Court might someday say the same thing about locking gay men and lesbians out of the workforce—another "central institution of the Nation's society." *See Id.* at 2602. But, as we noted earlier, in the same-sex marriage case, the Court was presented with the opportunity to consider the question as one of sex discrimination but declined to do so and thus far has declined to take any opportunity to weigh in on the question of sexual orientation discrimination under Title VII.

In addition to the Supreme Court's silence, Congress has time and time again said "no," to every attempt to add sexual orientation to the list of categories protected from discrimination by Title VII. *See Bibby*, 260 F.3d at 261 (compiling rejected legislation to add sexual orientation to Title VII).

This circuit has not remained silent on the matter, but rather, as we have described above, our own precedent holds

that Title VII provides no protection from nor redress for discrimination on the basis of sexual orientation. We require a compelling reason to overturn circuit precedent. *United States v. Lara–Unzueta*, 735 F.3d 954, 961 (7th Cir. 2013). Ordinarily this requires a decision of the Supreme Court or a change in legislation. *Id.* But it is also true that precedent can be overturned when "the rule has proven to be intolerable simply in defying practical workability … whether related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine … or whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 854–55 (1992). It may be that the rationale appellate courts, including this one, have used to distinguish between gender non-conformity discrimination claims and sexual orientation discrimination claims will not hold up under future rigorous analysis. It seems illogical to entertain gender non-conformity claims under Title VII where the non-conformity involves style of dress or manner of speaking, but not when the gender non-conformity involves the sine qua non of gender stereotypes—with whom a person engages in sexual relationships. And we can see no rational reason to entertain sex discrimination claims for those who defy gender norms by looking or acting stereotypically gay or lesbian (even if they are not), but not for those who are openly gay but otherwise comply with gender norms. We allow two women or two men to marry, but allow employers to terminate them for doing so. Perchance, in time, these inconsistencies will come to be seen as defying practical workability and will lead us to reconsider our precedent. *Id. See also Obergefell*, 135 S. Ct. at 2603 ("in interpreting the

Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged.")

Perhaps the writing is on the wall. It seems unlikely that our society can continue to condone a legal structure in which employees can be fired, harassed, demeaned, singled out for undesirable tasks, paid lower wages, demoted, passed over for promotions, and otherwise discriminated against solely based on who they date, love, or marry. The agency tasked with enforcing Title VII does not condone it, (*see Baldwin,* 2015 WL 4397641 at **5,10); many of the federal courts to consider the matter have stated that they do not condone it (*see, e.g., Vickers*, 453 F.3d at 764-65; *Bibby*, 260 F.3d at 265; *Simonton,* 232 F.3d at 35; *Higgins*, 194 F.3d at 259; *Rene*, 243 F.3d at 1209, (Hug, J., *dissenting*); *Kay*, 142 F. App'x at 51; *Silva*, 2000 WL 525573, at *1); and this court undoubtedly does not condone it (*see Ulane*, 742 F.2d at 1084). But writing on the wall is not enough. Until the writing comes in the form of a Supreme Court opinion or new legislation, we must adhere to the writing of our prior precedent, and therefore, the decision of the district court is AFFIRMED.

RIPPLE, *Circuit Judge*, joins the judgment of the court and joins Parts I and IIA of the panel's opinion.